598 N.E.2d 456 (1992)
233 Ill. App.3d 88
174 Ill.Dec. 259
In re S.J., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
T.J. et al., Respondents-Appellants).
No. 2-91-0955.
Appellate Court of Illinois, Second District.
August 20, 1992.
As Amended on Denial of Rehearing September 21, 1992.
*457 Richard S. Kopsick, Staben & Kopsick, Waukegan, Ceckowski Venturi, Valerie Boettle Ceckowski, Ceckowski & Venturi Ltd., Gurnee, for N.B.
Ceckowski Venturi, Valerie Boettle Ceckowski, Ceckowski & Venturi Ltd., Gurnee, for T.J.
Michael J. Waller, Lake County State's Atty., Waukegan, William L. Browers, Deputy Director, Mary Beth Burns, State's Attys. Appellate Prosecutor, Elgin, for People.
Justice BOWMAN delivered the opinion of the court:
Respondents T.J., the mother, and N.B., the father, appeal from trial court orders finding them unfit parents, terminating their parental rights in their minor daughter S.J., and giving the Department of Children and Family Services (DCFS) custody of S.J. with the power to consent to her adoption.
The court held that both parents were unfit under the standards of the Adoption Act (Ill.Rev.Stat.1989, ch. 40, par. 1501 et seq.) in that (1) they failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare (Ill. Rev.Stat.1989, ch. 40, par. 1501(D)(b)); and (2) they failed to make reasonable efforts to correct the conditions which were the basis for the original removal of S.J. from her parents, or to make reasonable progress toward the return of S.J. to them within 12 months after S.J. was adjudicated a neglected minor (Ill.Rev.Stat.1989, ch. 40, par. 1501(D)(m)). The court also found that N.B. failed for a period of 12 months to maintain contact with or plan for the future *458 of S.J. (Ill.Rev.Stat.1989, ch. 40, par. 1501(D)(n)). Respondents contend that the court's findings are against the manifest weight of the evidence.
We affirm the trial court's finding that N.B. was unfit and the resultant termination of N.B.'s parental rights. We reverse the finding that T.J. was unfit and the resultant termination of T.J.'s parental rights.
On July 6, 1989, S.J. was born with cocaine in her system. The State alleged, the mother admitted, and the father failed to contest that S.J. was a neglected child (Ill. Rev.Stat.1989, ch. 37, par. 802-3(1)(a)). The court temporarily placed S.J. in a Catholic Charities (CC) foster home.
On August 10, 1989, at a hearing at which the mother but not the father attended, S.J. was adjudicated a neglected minor and made a ward of the court. The court ordered that S.J. remain in foster care, with DCFS to supervise visitation. The court also ordered that: (1) both respondents participate and successfully complete parenting classes and sign all necessary release of information forms; (2) T.J. participate in, follow all the recommendations of, and complete a substance abuse/alcohol treatment program; (3) T.J. participate in Narcotics Anonymous meetings and provide verification of attendance; (4) N.B. complete a drug evaluation within 30 days; (5) both respondents refrain from ingesting any illegal substances; and (6) both respondents sign release of information forms from previous treatment programs to provide information to DCFS.
In September 1989, a DCFS social history report to the court indicated that the mother's address was 2525 Carver in North Chicago, the father's address was unknown, and neither parent had a telephone. It further indicated that T.J. was 22 years old and had five children. She had an eighth-grade education, a total of 11 months' employment experience, and no special job skills. Her only income was a combination of public aid and food stamps totaling $675 a month. T.J. started using cocaine after N.B. went to prison, which was shortly after she became pregnant with her fourth child (and the first of two by N.B.). In May 1988, this child was born with cocaine in his system. Both parents were then referred to the "Family Preservation Program," but later "terminated due to lack of cooperation."
T.J. said that when she started trying to get high while in labor with S.J., she realized the seriousness of her drug problem; after S.J. was born, T.J. underwent five days of "detox" at the Lake County Health Department (LCHD).
In LCHD's Substance Abuse Program's May 23, 1989, "initial assessment" of T.J., she stated that her main drug of abuse was cocaine, but that she also used (and did not want to give up) marijuana. She reported using alcohol and marijuana since age 15 and cocaine since age 20. LCHD formulated a treatment plan involving regular group and individual therapy. On May 22, 1989, T.J. tested positive for cocaine and marijuana.
On June 28, 1989, LCHD reported that T.J. had attended only two individual counseling sessions and had been not been heard from since. LCHD concluded that T.J. had made no progress, that her prognosis was poor, and that she should receive inpatient treatment for cocaine dependence. LCHD therefore was closing her case because she refused treatment.
DCFS reported that T.J. was eager to visit and become reunited with S.J. T.J. had been present at most of the scheduled visits and had called with appropriate explanations when unable to attend. T.J. behaved appropriately with S.J. at these visits. T.J. arranged to take parenting classes but missed the first class because her ride did not show up.
DCFS recommended that S.J., whose health was fragile but improving somewhat, be kept in foster care under DCFS' guardianship; that supervised visits continue for both parents; that T.J. enroll in substance abuse treatment programs and attend Narcotics Anonymous meetings; that N.B. complete drug evaluation; that both respondents complete parenting classes approved by DCFS; and that the case be reviewed in 90 days.
*459 On September 18, 1989, the court entered an order continuing all previous orders in effect with the following modifications. The court required T.J. to attend substance abuse counseling and other recommended counseling; to have, within 30 days, a written evaluation recommending either outpatient or inpatient treatment; to refrain from ingesting any drugs or alcohol; and to submit to random urinalysis by the LCHD Substance Abuse Program.
In a November visit, T.J. told DCFS that "she felt no matter what she did she would not get [S.J.] back"; T.J. had decided to stop visiting S.J. because after each visit T.J. became upset that she could not take S.J. back with her. T.J. was angry that she was not allowed to raise her baby when she was taking care of other neighborhood children whose parents were using cocaine. T.J. admitted that she was using cocaine and marijuana whenever she became upset. She was considering inpatient drug treatment but had not come to a decision. She was seeing N.B., but he had not moved back in with her.
DCFS repeated the recommendations in its previous report.
On January 18, 1989, DCFS sent the court its report on the case. The report included an evaluation of respondents' progress up to December 18, 1989, and a copy of a new client service plan, dated December 18, 1989.
As of December 18, 1989, the report indicated that neither parent was making satisfactory progress toward reunification with S.J. N.B. had last visited S.J. on August 7, 1989, and T.J. last visited the child on September 11, 1989. T.J. was not making satisfactory progress toward demonstrating her "ability to provide a safe, nurturing environment" for S.J. Neither parent had followed through with drug treatment or parenting classes.
As of December 18, 1989, neither DCFS nor CC knew the respondents' whereabouts. On that day, DCFS drew up a new client service plan with a "planned achievement date" of June 30, 1990. DCFS notes indicated that T.J. had had no contact with S.J. since September 11, 1989. However, on December 5, 1989, T.J. went to CC headquarters and left a toy for S.J. On December 13, 1989, T.J. told CC by telephone that her family was homeless because her five-year-old daughter, playing with matches, had burned down T.J.'s apartment. The Red Cross found the family temporary shelter.
On January 2, 1990, T.J., after exhausting aid available from various sources, went to CC's office and stated that "she and her four children were hungry and homeless." The next day, a DCFS investigator talked to T.J. outside a motel where, apparently, T.J. had been staying. The investigator told DCFS that T.J. told him the following about her family: two children were staying with their biological father, F.J., in North Chicago; one child was staying with a friend of T.J. in North Chicago; and the fourth child, of whom N.B. was the father, was staying with a woman in North Chicago. N.B. was "allegedly in jail for driving without a valid driver's license and traffic violations." The investigator found that the four children were "placed and doing quite well." The investigator also related that T.J. told him that she had come to CC's office on January 2, 1990, to pull a "scam" on the agency.
On January 15, 1990, T.J. asked CC to provide DCFS information on the substance abuse outpatient program at the LCHD. On January 16, T.J. called the program and scheduled a drug evaluation for January 19.
The December 18, 1989, service plan imposed certain tasks, primarily in the areas of visitation and drug treatment, on both respondents. The respondents, providing their own transportation, were to visit S.J. weekly on Tuesday mornings at the CC office in Waukegan; T.J. would call DCFS 24 hours in advance to confirm the visits; the parents would be responsible for all of S.J.'s care during the visits and would demonstrate loving care; and any visit would be cancelled immediately if either parent showed up intoxicated or under the influence of illegal substances.
Furthermore, both respondents would promptly complete drug and alcohol assessments *460 and follow through on all recommendations; successfully complete an eight-session "parenting training program"; consent to releases of information to CC and DCFS as necessary for those agencies to continue assessing the case; maintain weekly contact with CC; demonstrate adequate housing, food and clothing for S.J.'s needs; demonstrate their "ability to care for a cocaine addicted [sic] infant"; verify that they had legal means of support for themselves; and keep CC informed of their whereabouts.
On March 30, 1990, a DCFS report to the court stated that T.J. failed to keep her January 19, 1990, appointment for a drug evaluation. The caseworker did not know if T.J. had followed through with any later appointments. Respondents had not visited S.J. since the last report. Attempts to contact T.J. by registered and regular mail had failed. N.B.'s whereabouts were unknown. DCFS made the customary recommendations for supervised visits, drug evaluations, and parenting classes.
On June 8, 1990, DCFS again updated the court. S.J.'s health was delicate, but she seemed to be "on target" developmentally. A report on T.J.'s progress was mixed. T.J. received a drug evaluation on April 10, 1990, and was urged to participate in both individual counseling and weekly group therapy at the Lake County Substance Abuse Clinic. Her counselor at the clinic reported that T.J. attended regularly for about a month; after that, T.J. informed the clinic that she would not attend group therapy because it was not helpful. T.J.'s urine tests had been "clean" to date.
T.J. had recently moved from North Chicago to Round Lake to get away from those who had been a "`bad influence'" on her. T.J. had four children at home, no car and no access to public transportation; thus, it was hard for her to attend her meetings.
T.J. had visited regularly with S.J. since the last court date. T.J. was cooperative and patient with S.J., and S.J. was feeling increasingly comfortable with T.J. and the other children. Since April 24, visits had been increased to twice a week for four hours at a time at T.J.'s home. CC was helping T.J. obtain furniture.
T.J. advised DCFS that N.B. was incarcerated at Galesburg for a probation violation, that he might be released in November, and that after his release T.J. and N.B. would get back together and perhaps marry.
Caseworker reports indicated that T.J. was sincerely trying to "get her life together" and was making genuine progress in both drug rehabilitation and interaction with S.J. Recommendations were to allow increased and unsupervised visitation between mother and daughter; that T.J. receive regular group and individual drug counseling and submit to random urine tests; and that, upon release from prison, N.B. receive a drug evaluation and follow all treatment recommendations. The caseworker recommended returning S.J. to T.J. on or before the next court date.
As of June 8, 1990, T.J. had shown up for six out of eight individual counseling sessions and four of eight women's support groups. T.J. had been compliant at the outset, but was not confronting or acknowledging her basic problem with drug use. She had not obtained a sponsor as requested. T.J.'s first urine drop came back positive for marijuana. Despite T.J.'s problems, she had been open and honest during therapy. Continued counseling was recommended.
On June 11, 1990, the circuit court entered an order continuing wardship and otherwise adopting DCFS' recommendations.
On June 29, 1990, the caseworker's evaluation on respondent's progress indicated that: T.J. was making satisfactory progress, but N.B. was not; T.J. seldom cancelled visits and was very patient with her daughter; T.J. demonstrated both affection and proper care for S.J. during visits; mother and child were becoming closer, although S.J. still displayed some anxiety when the foster mother was not around; and S.J. also seemed to be getting more comfortable with her siblings.
*461 N.B. had been unable to visit S.J. because was in prison. He had not communicated with DCFS.
N.B. had made no progress toward the objective of "maintain[ing] a drug free lifestyle in order to maintain a safe, nurturing environment" for S.J. He had not cooperated at all with DCFS' or CC's efforts in this regard. T.J. was doing better, but her last two urine tests were positive for marijuana, and she had stopped attending group therapy and had not gone to Narcotics Anonymous meetings.
Neither parent had participated in parenting classes. However, T.J. was progressing satisfactorily toward providing adequate care, housing and support for S.J. Since April 21, 1990, T.J. had regularly visited her daughter, was acquiring furniture, received enough income to provide adequate food in her new home, and had cooperated with DCFS.
DCFS drew up a new client service plan for June 29, 1990, with a planned achievement date of December, 1990. Under the objective of "visitation," the plan called for continuing unsupervised visits at T.J.'s home, with DCFS having discretion to provide for longer and more frequent visits. T.J. would notify CC promptly of her unavailability for any visit. To demonstrate her ability to maintain a drug-free lifestyle for the benefit of S.J., T.J. would become involved in weekly group and individual counseling, provide random urine drops as requested, find a sponsor, demonstrate her ability to remain drug-free for "at least 6-9 months," and demonstrate her ability to maintain appropriate housing, clothing and shelter for herself and her children.
The new plan called for N.B. to demonstrate his ability to lead a drug-free lifestyle for the benefit of S.J. Specifically, N.B. would promptly obtain a drug-alcohol evaluation and follow all recommendations for treatment; consent to release of information to DCFS and CC; attend Narcotics Anonymous meetings; cooperate with DCFS and CC; and demonstrate legal means of support for S.J. and "his other children."
Both parents were to demonstrate their ability to provide a safe, nurturing environment for the four children under T.J.'s custody. The new plan called for the parents to demonstrate their ability to maintain appropriate housing, furnishings and clothing for themselves and their children; ensure that the children's medical needs, including immunizations, were met; ensure that their children regularly attended school or Head Start; and ensure that the parents or other responsible adults properly supervise the children at all times.
On July 26, 1990, DCFS reported to the court that T.J. was doing poorly with drug rehabilitation but well with visitation. On the first score, T.J.'s three urine specimens of April 11, May 23, and June 28 all tested positive for marijuana. T.J. had missed four of six individual therapy sessions and four of six group sessions. T.J. had stated that she `"didn't feel like going.'" On July 13, 1990, homemaker services were started, in part to help T.J. with transportation to and from her sessions. T.J. was unavailable for the homemaker on July 17 and 19.
Visits between T.J. and S.J. were continuing at twice a week for four hours at a time at T.J.'s home. The visits were "going very well." S.J. was comfortable with her mother and siblings. T.J. was unavailable for one visit, explaining that she went to Gary, Indiana, to help her mother, a drug user. T.J. had taken steps to enroll her children in school, had expressed a desire to obtain her GED, and had asked public aid about "Project Chance." DCFS' recommendations were essentially similar to its previous ones.
On July 30, 1990, the court ordered T.J. to refrain from using illegal drugs and to cooperate with all reasonable requests of DCFS and CC.
The next update came on September 17, 1990. The caseworker reported some improvement in S.J.'s health. T.J., however, was not cooperating with drug therapy. T.J. missed 7 of 11 individual therapy sessions from July 5 through September 13, and 6 out of 11 group therapy sessions. She was not taking advantage of the homemaker *462 service's assistance with transportation. On July 26, T.J.'s urine test indicated a high level of marijuana use. T.J. refused to attend other recommended counseling. T.J.'s caseworker recommended that T.J. undergo inpatient treatment.
Visits with S.J. continued to go well, though T.J.'s positive drug tests prevented any increase in the visits' frequency or duration. However, without notifying CC or DCFS, on August 14, 1990, T.J. took S.J. to Waukegan and did not return S.J. to foster care until 6 p.m., over four hours late. After being warned that such conduct could jeopardize future visitation, T.J. abided by the visit schedules.
On September 21, 1990, T.J. had been discharged from the substance abuse program. T.J. had been inconsistent in showing up for therapy, had not obtained a sponsor, and had repeatedly tested positive for marijuana. LCHD's recommendations included long-term inpatient care.
On November 2, 1990, DCFS reported to the court that T.J. was doing poorly both in drug rehabilitation and in visitation. Although long-term inpatient therapy was recommended, T.J. stated she did not want inpatient treatment.
Caseworker reports indicated that T.J. was uncooperative with the homemaker. T.J. was not home to greet the homemaker on September 18 or 20. On September 20, homemaker service was reduced to once per week because T.J. misused the service. On September 25, the homemaker arrived but T.J. refused to come home from next door for service. On October 23, 1990, the homemaker visited. F.J., father of T.J.'s oldest son, told the homemaker that he did not know where T.J. was.
Visitation was deteriorating. When the foster mother brought S.J. for visits, T.J. either was sleeping or did not answer the door for long periods of time. Therefore, as of October 8, 1990, DCFS required T.J. to pick up S.J. at CC's Round Lake office. Despite receiving notice of this new policy, T.J. had neither confirmed nor shown any interest in her seven allotted visits. When a CC worker went to T.J.'s home on October 25, 1990, somebody pulled back the curtain, but nobody answered the door.
A caseworker concluded that T.J. had failed to visit S.J. or to cooperate with the CC caseworker, failed to comply with the substance abuse program, and had not entered the inpatient treatment program that LCHD had recommended. Furthermore, T.J. had not cooperated with the homemaker service. Recommendations were that T.J. and S.J. have unsupervised visits at DCFS' discretion; that T.J. follow all recommendations for substance abuse treatment; that N.B., after incarceration, cooperate with drug testing and follow all drug recommendations; and that S.J. remain a ward of the court.
On November 20, 1990, less than three weeks after DCFS sent the court its report, the State filed its amended petition to terminate both respondents' parental rights. The petition alleged that both parents had failed to maintain a reasonable degree of interest, concern or responsibility as to S.J.'s welfare (Ill.Rev.Stat.1989, ch. 40, par. 1501(D)(b)); that both had failed to make reasonable efforts to correct the conditions that were the basis for removing S.J. or to make reasonable progress toward the return of S.J. within 12 months of the adjudication of neglect (Ill.Rev.Stat.1989, ch. 40, par. 1501(D)(m)); that N.B. had failed for a period of 12 months to maintain contact with or plan for the future of his child (Ill.Rev.Stat.1989, ch. 40, par. 1501(D)(n)); and that T.J. had been "habitually addicted to drugs" for at least a year before the petition (Ill.Rev.Stat.1989, ch. 40, par. 1501(D)(k)).
Between November 20, 1990, and the hearing on the petition, DCFS and CC reported further on respondents' progress (or lack of same) under the June 29, 1990, client service plan. DCFS' December 3, 1990, report concluded that progress in the area of visitation was satisfactory. Visits had been taking place regularly since November 8, 1990, when DCFS changed the site of visitation from CC's office back to T.J.'s home. The report did note the August 17, 1990, incident (when T.J. returned S.J. several hours late) and also expressed *463 concern over T.J.'s failure to call to confirm visits and lack of readiness to receive S.J.
The report concluded that both parents had made "unsatisfactory progress" in demonstrating the ability to maintain a drug-free lifestyle in order to maintain a safe, nurturing and stable environment for S.J. After a court hearing on November 8, 1990, T.J. had reenrolled in the LCHD substance abuse program. T.J. had yet to attend any meetings because she could not find transportation; DCFS explained that the program was not providing T.J. with cab services because she had yet to "show[ ] effort by taking [public transportation] twice." DCFS noted that on November 21, 1990, LCHD had discharged T.J. from its substance abuse program because of her failure to attend counseling or find a sponsor and because, on several occasions, she had tested positive for marijuana. However, T.J. was providing satisfactory housing, furniture and clothing for herself and her children.
N.B. was released from prison in November 1990 and was currently residing with T.J. He had not participated in any substance abuse program, documented that he had a legal means of support, or verified attendance at any Narcotics Anonymous or similar drug counseling sessions.
DCFS did acknowledge that respondents were making satisfactory progress in providing a safe, stable and nurturing environment for the four children other than S.J. Respondents had not documented that they had met all of the children's medical needs. However, the children were receiving appropriate housing, schooling and supervision.
On December 3, 1990, with neither parent present, DCFS drew up a new service plan with a planned achievement date of June 1, 1991. The plan called for regular unsupervised visitation at T.J.'s home at least weekly. Both parents were to demonstrate appropriate skills in caring for S.J. and to provide a safe, nurturing environment for the four children of whom T.J. had custody. Both parents were to cooperate with all drug treatment and counseling programs. Specifically, the plan required N.B. to undergo a drug evaluation by December 17, 1990, and required T.J. to obtain a sponsor by December 17, 1990.
DCFS submitted its next progress report on December 14, 1990. The agency made recommendations similar to those in the December 3 report. DCFS noted that T.J. had not complied with past court orders regarding drug treatment and N.B. had yet to obtain a drug/alcohol evaluation.
Enclosed with DCFS' report was a letter of December 10, 1990, from pediatrician J. Randall Kinsella. Kinsella stated that, for the last several weeks, S.J. had displayed "extreme emotional changes and self destructive behaviors for several days" after each visit with T.J. Kinsella recommended that S.J. not visit her mother for the next few weeks and that future visits be supervised.
A DCFS report indicated that S.J.'s foster mother, Debra Perez, had noted that since the resumption of home visits S.J. was engaging far more frequently in self-abusive and physically aggressive behavior. S.J. cried continuously and did not want to be taken to T.J.'s home. Both parents had failed to participate in substance abuse programs. T.J. had failed to care properly for S.J. Respondents missed only one visit, but S.J. came back from visits dirty and wearing soiled diapers. T.J. did not use the baby supplies, such as bibs and diapers, that the homemaker provided.
DCFS sent the court two reports from the homemaker assigned to the case. The report for October 1990 stated that the physical appearance of T.J.'s home was improving and that the four children of whom T.J. had custody were "well and OK." The reports were more equivocal about S.J.'s relationship with respondents. S.J. seemed reluctant to leave the foster mother and, upon coming to visit T.J., cried for "some time before settling down to normal. N.B. showed affection for all of his children, especially S.J.; on one occasion, S.J. wanted to be with N.B. but not T.J. The report for November 1990 stated that S.J. continued to "cry out of control" upon seeing T.J.
On March 1, 1991, a substance abuse counselor with LCHD reported that T.J. *464 had had four appointments scheduled. T.J. had cancelled the first for lack of transportation; the counselor had to cancel the second one. T.J. showed up for the third meeting but missed the fourth one, which was scheduled for February 22, 1991.
The court granted several continuances before hearing evidence on the State's petition. As of April 12, 1991, N.B. had been sentenced to two years in the Department of Corrections; the court issued a writ of habeas corpus so that N.B. could testify. On May 30, 1991, the court began its hearing on the State's petition. Before any testimony, the State and counsel for T.J. stipulated that each party would present evidence up to the hearing date (rather than merely up to the date the petition was filed) regarding T.J.'s cooperation with visitation and drug therapy.
Betty Rucker of DCFS testified that she met with respondents when respondents visited S.J. on August 7, 1989. Rucker and respondents discussed the goal of reuniting S.J. with respondents. T.J. was cooperative but N.B. was hostile, telling Rucker that he would refuse to participate. Rucker never saw N.B. again. She sent him letters but he never responded.
On August 24, 1989, Rucker and T.J. discussed the first client service plan. Neither parent met with Rucker to discuss the December 12, 1989, service plan.
Rucker recounted that DCFS scheduled nine opportunities for respondents to visit S.J. between August 14, 1989, and September 18, 1989. T.J. showed up for four of these visits, cancelled another, and did not show for the rest. N.B. missed all the visits. T.J. became angry when Rucker later explained that the lack of visitation could endanger T.J.'s parental rights. T.J. explained to Rucker that she got to visits by taking the bus or getting a ride from an older friend of hers, Bob Askew. T.J. did not tell Rucker that she was having trouble getting to visits. T.J. did not show up for a meeting to discuss obtaining homemaker services to assist with transportation.
Rucker acknowledged that during July, August and half of September 1989, T.J. generally cooperated with CC regarding visitation. On visits to T.J.'s North Chicago apartment, Rucker noted that the furniture, food, and level of cleanliness were all satisfactory.
To Rucker's knowledge, neither respondent attended any parenting classes or obtained any drug evaluation while Rucker was assigned to the case. N.B. was hostile to the idea of a drug evaluation.
JoAnn Fitzgerald of DCFS testified that she wrote T.J. on March 22, 1990, expressing concern that T.J. had not visited S.J. since September 11, 1989. Although T.J. did not respond directly to the letter, the two met in court on April 2, 1990, and T.J. there expressed interest both in arranging visitation and in getting a drug evaluation.
Fitzgerald and T.J. set up a visitation schedule. The first two visits, in April, were for one hour weekly at CC's office; the visits were then increased to twice weekly. T.J. kept all her scheduled visits for May and missed one in June. By June, T.J. had moved to Round Lake, and the foster mother, Debra Perez, brought S.J. to T.J.'s home twice weekly for four-hour unsupervised visits. Fitzgerald acknowledged that T.J. returned S.J. late on August 14, 1990, because T.J. had gone to "Project Chance" to obtain clothing for herself and her children. After this incident, Fitzgerald attended the visits at T.J.'s home. These visits went well. T.J. made a genuine effort to become reacquainted with S.J., and S.J. became less fearful of and more attentive to her.
Fitzgerald estimated that when she was T.J.'s caseworker, T.J. missed perhaps 4 out of 28 scheduled visits. Transportation to CC's office (to which visitation was moved after September) was a major problem for T.J. after the move to Round Lake. Cabs were available but very expensive. Weekly homemaker service, initiated July 13, 1990, was an attempt to deal with this problem.
Fitzgerald recounted that T.J. received a drug evaluation as scheduled on April 10, 1990. When Fitzgerald told T.J. that Amy Tsuji, her counselor at the Lake County Substance Abuse Clinic, recommended inpatient *465 treatment, T.J. responded that she did not feel that was necessary and that she worried who would take care of her children. When Fitzgerald visited T.J. in August, the latter admitted that she had been using marijuana since age 12; T.J. did not see how she could stop and said that one reason she used marijuana was to help her relax when her children strained her nerves.
Fitzgerald acknowledged that all her reports credited T.J. with making progress with both visitation and drug counseling. Fitzgerald never met N.B. She was not involved with the case after September 1990.
Saba Khan of DCFS testified that on October 23, 1990, she took over as CC caseworker on the case. T.J. missed scheduled visitations for October and for November 2 and 6, 1990. When Khan picked up S.J. from a visit on November 9, 1990, the baby was "dirty, stinking * * * crying and very upset." On other occasions, S.J. was not crying or upset upon her return from T.J.'s home.
On several other visits in November 1990, S.J. cried and had tantrums on the way to her mother's house; when Khan picked her up, S.J. was playing by herself while her parents watched television.
On December 14, 1990, after a scheduled visit did not take place, the court temporarily suspended visitation. By order of December 17, visitation was to occur under supervision each Friday for two hours at CC's office. T.J. was to confirm the visits a day in advance. Despite Khan's numerous reminders, T.J. attended only one such visit, on March 14, 1991, and called to confirm only one other visit (for which she did not show). During the period that visitation had stopped entirely, neither parent called Khan to inquire about S.J.'s well-being.
On cross-examination, Khan conceded that neither respondent had access to a car as of November 1990. She admitted that, when DCFS changed the location of visitation from T.J.'s home to CC offices, no one made arrangements for T.J.'s transportation. T.J. requested that visits be changed from Fridays to Tuesdays so that the homemaker could drive her to visitations, but the foster mother's schedule prevented this change. DCFS and CC made no attempt to arrange transportation for T.J.'s Friday visits.
Khan explained that she believed that the court suspended visitation in December because the visits were upsetting S.J. emotionally. After December 17, 1990, T.J. told Khan several times that she did not want to visit her child if the visits upset S.J. Khan agreed that T.J. had become pregnant late in 1990, that T.J. had been ill throughout the pregnancy, and that T.J. had given birth just a few days before the hearing on the petition.
When Khan became involved in the case, she learned that T.J. was not then receiving any substance abuse treatment or counseling. Late in February, Jennifer Groskopf, a substance abuse counselor with LCHD, told Khan that T.J. was participating in substance abuse counseling and that T.J.'s recent drug tests had come back negative.
On November 9, 1990, Khan brought S.J. to T.J.'s home for a visit. N.B., recently released from prison, was there. He and Khan discussed visitation and the importance of N.B. obtaining a drug evaluation and drug treatment. N.B. visited S.J. about five times. To Khan's knowledge, N.B. never received his court-ordered drug evaluation. On March 5, 1991, after several unsuccessful attempts to contact N.B., Khan became aware that N.B. was back in prison. He had not notified her of his new address. From then on, she did not attempt to contact him.
Susan Seeberg of DCFS testified for the State. She acknowledged that as of June 29, 1990, T.J. was making satisfactory progress on visitation as per the December 18, 1989, service plan. T.J. had kept up regular visitation with S.J. from April 1990 through June 1990. From April 1990 through about August 1990, T.J. was "pretty much complying" with the various aspects of the service plan, including drug treatment. As of December 1990, T.J. was doing satisfactorily in visiting S.J., keeping *466 in touch with the caseworker, and providing adequate housing.
N.B. was making unsatisfactory progress as of June 29, 1990, but Seeberg admitted that N.B. was in prison from December 18, 1989, through June 29, 1990. DCFS had attempted unsuccessfully to contact N.B. while he was in prison.
N.B. did not contact DCFS at all while he was in prison; had he sent S.J. letters, cards or gifts or made collect calls to DCFS about S.J.'s well-being, DCFS could have rated his progress satisfactory. Seeberg concededly did not know how often N.B. had asked T.J. about S.J.; possibly, enough such inquiries would also demonstrate a satisfactory level of interest in the child. Also, Seeberg stated that N.B.'s unsatisfactory rating in June 1990 was due to his incarceration and not because he had not shown love and affection for his daughter.
To Seeberg's knowledge, N.B. had never received the drug evaluation required by the June 29, 1990, service plan.
Neither respondent had attended the parenting classes mentioned in the August 1989 client service plan.
Seeberg stated that DCFS' goal remained reuniting the parents with their child. To this end, DCFS drew up a new client service plan in December 1990; the plan was still in effect at the time of the hearing, with a progress report scheduled for June 1991.
Amy Tsuji of DCFS testified that, beginning April 2, 1990, she had supervised T.J.'s participation in outpatient drug therapy. On April 12, 1990, based on information that T.J. supplied, Tsuji concluded that T.J. was dependent on marijuana and cocaine. Tsuji recommended that T.J. attend individual and group therapy and that T.J. submit to random urine tests. Monthly tests from April through July 1990 were positive for marijuana.
On September 21, 1990, T.J. was discharged from therapy. Tsuji concluded at that time that T.J.'s chances for improvement with outpatient therapy were poor, as T.J. resisted treatment. Talking to T.J. about the problem was "like talking to a brick wall." However, on September 21, 1990, T.J. angrily complained about being discharged from therapy and demanded that Tsuji help arrange transportation to the program in Waukegan. On November 15, 1990, T.J. called Tsuji and requested readmission to therapy. Tsuji set up an appointment for November 20, but T.J. failed to show or to call for rescheduling.
Tsuji opined that at the time Tsuji was working with her, T.J. was suffering from late stage addiction to marijuana. Tsuji conceded that none of T.J.'s urine tests were positive for cocaine or any drug other than marijuana; however, this was not progress in Tsuji's view because T.J. had been asked to abstain from all mood-altering drugs. Tsuji admitted that on April 20, 1990, and June 8, 1990, she informed CC by letter that T.J. was making progress and that T.J. had attended a majority of the scheduled counseling sessions.
The State called Jean Merczek, who supervised CC caseworkers Fitzgerald and Khan and, from October 1 through 23, 1990, was the caseworker for S.J. At an October 8, 1990, home visit, T.J. refused Merczek's recommendation of inpatient drug therapy, explaining that she considered it unnecessary.
At this visit, Merczek told T.J. that, primarily because of the August 14 "unusual incident," visits were being changed from T.J.'s home to CC's Round Lake office, two or three miles away, each Friday. T.J. asked Merczek if the latter could arrange transportation, but Merczek explained that CC normally did not transport parents to visits; the agency would at most help T.J. to arrange transportation from another source. At the time of the meeting, Merczek did not know whether T.J. was receiving homemaker services.
Merczek testified that T.J. missed the scheduled visits because of a lack of advance confirmation, not because T.J. lacked transportation. Merczek did not know whether T.J.'s house had a phone, and she admitted that there was no direct public transportation from T.J.'s home to the CC Round Lake office. When she took over *467 the case, Merczek was unaware that T.J. was pregnant.
Merczek never personally met N.B.
Merlean Lovelady testified that she was the third homemaker provided for T.J. She began working for T.J. in mid-September 1990. After T.J. was discharged from the substance abuse program, Lovelady visited T.J.'s home each Tuesday to help T.J. with shopping, laundry and some aspects of child care. On 14 occasions, T.J. was not home when Lovelady went there to provide services. When T.J. left for Waukegan with S.J. and N.B. on November 27, she brought S.J. back on time.
Twice in November, Lovelady transported S.J. to T.J.'s home for visits. Both respondents were present each time. On each visit, S.J. would be very upset at first, but T.J. would try to comfort her, and the child soon settled down. Both parents appeared warm and caring toward S.J.; they played and watched "Sesame Street" with the child, and N.B. cooked for her. S.J. seemed to enjoy being with them. The home was neat and tidy and becoming more so, even though T.J.'s pregnancy sometimes made her feel like skipping housework. However, at the end of the month, the home visits were discontinued because S.J. broke out in hives after each visit.
Lovelady told T.J. that, despite the latter's inquiries, neither Lovelady nor CC could provide T.J. transportation to its Round Lake office for the Friday visits.
Debra Perez, S.J.'s foster mother, testified that, as of the hearing date, S.J. had spent one birthday and two Christmases with Perez. On none of these occasions did either respondent send S.J. a card. Between the neglect adjudication and June 1990, T.J. sent S.J. a rocking horse, a couple of rattles, several outfits and some barrettes. T.J. supplied some of the outfits shortly before S.J.'s birthday, but Perez could not recall any other birthday or Christmas gifts from respondents to S.J.
Perez had recently been asked to change S.J.'s visitation from Fridays to Tuesdays. Perez's numerous other Tuesday commitments prevented such a change.
In April and May 1990, while visits were still supervised, Perez and T.J. spent much time in conversation, and T.J. was responsive to the foster mother's suggestions about caring for S.J.
Perez's only personal contact with N.B. was at a visit in July 1989. On this occasion, N.B. was holding S.J. and acting appropriately. Shortly after this visit, N.B. sent CC a stuffed toy for S.J., but Perez knew of nothing more that N.B. had done for his daughter. Perez had not heard from N.B. while he was in prison.
After the trial court denied respondents' motions for directed findings, N.B. testified on his own behalf. N.B. was 29 years old at the time of the hearing. He had been incarcerated at Danville on a parole violation since March 1991. He was earlier incarcerated from December 22, 1989, through November 1, 1990.
In July 1989, when S.J. was born, N.B. was living in North Chicago. He visited his child several times that month both at the hospital and at the CC office. After S.J. became a ward of the court, N.B. wished to have her returned to her parents. However, he declined to contact DCFS or CC, to go to any scheduled visits, or to obtain any drug evaluation, as he was trying to avoid arrest on an outstanding warrant. Between the neglect adjudication and his own incarceration, N.B. did nothing to supply T.J. with cocaine and encouraged her to keep abstaining. He also gave her some money to help pay bills.
In December 1989, after being stopped for driving without a license, N.B. was arrested on the outstanding warrant. While in custody through November 1, 1991, he had no contact with CC or DCFS and did not know either agency's address or phone number. However, while he was incarcerated, he called T.J. 20 to 25 times and wrote her 15 to 20 times during this period, regularly expressing concern both for S.J. and for T.J.'s attempt to stay off cocaine. When he called T.J., he would tell the baby hello. He never asked T.J. or any prison counselors for the address or telephone number of either DCFS or CC. At *468 the hearing, he explained that he did not think this information would do him any good while he was in prison.
N.B. admitted that he had smoked marijuana since age 10 as part of the religion in which he was brought up in his native Jamaica. After his release from prison in November 1990, N.B. went to live with T.J. in Round Lake. He did not obtain a drug evaluation because he had no money and nobody from DCFS or CC informed him of any available free evaluations. After his release, he had smoked marijuana only about three times. A friend gave him money to obtain the drug. He believed that he "could handle" marijuana.
N.B. testified that, when he was not in prison, he lived with T.J. and helped her care for S.J. When S.J. came over for visits, he would feed her, play with her, watch "Sesame Street" with her, and hug and kiss her. However, N.B. admitted that he missed 11 scheduled visits between December 21, 1990, and March 1, 1991. He offered no explanation for these absences.
From November 1, 1990, through March 1, 1991, while he was living with T.J., N.B. never saw T.J. use cocaine or any cocaine-related paraphernalia. He did not encourage her to use either cocaine or marijuana, but did not believe that her use of marijuana impaired her ability to be a good parent.
Two people involved in T.J.'s recent drug counseling testified. The first was Scott Gielow, assistant clinical coordinator of the substance abuse program at the Lake County Health Department at Lake Villa. T.J. called the program in November 1990 and had been receiving counseling from Jennifer Groskopf since February 8, 1991. Since starting counseling at Lake Villa, T.J. had undergone two urinalyses. Both were negative for cocaine, marijuana and all other drugs tested. T.J. was cooperating with the program, attending as regularly as she could given difficulties with transportation. T.J. relied on taxicab rides subsidized by Public Aid.
Gielow was aware that T.J. had not followed through on counseling from Amy Tsuji. Even though Tsuji had recommended T.J. seek long-term inpatient care, Gielow maintained that T.J. was making significant progress in the Lake Villa program. He based this opinion on T.J.'s willingness to confront her drug problem, her steady attendance at counseling, her recent urinalyses, and the fact that her most recent baby was born drug-free.
Jennifer Groskopf testified that she and T.J. first met in person on February 8, 1991. Since writing her noncommittal letter to Saba Khan on March 1, 1991, Groskopf had met weekly with T.J. nine times; T.J. had also participated in group counseling. Groskopf was aware of T.J.'s transportation problems and of the strain that pregnancy put on T.J. through most of the time that T.J. had been under Groskopf's care. According to Groskopf, transportation difficulties were the only reason that T.J. did not attend meetings more regularly.
Groskopf was very optimistic about T.J. She considered T.J.'s prognosis "good" and believed that T.J. had made "incredible progress" considering T.J.'s overall drug history. T.J.'s "relapses" in previous programs did not necessarily mean that she would suffer another "relapse." Groskopf was aware of T.J.'s previous failures, but would not recommend T.J. for inpatient treatment as T.J. was currently "drug-free."
According to Groskopf, there was no basis to diagnose T.J. as addicted to cocaine or marijuana. T.J.'s previous use of the drugs would not necessarily support such an unfavorable diagnosis, although one so classified upon entering a program would not have that classification changed as a result of two negative urine tests.
Because T.J. was having difficulties obtaining transportation to visits with S.J., Groskopf, on April 25, 1991, asked Saba Khan if visitation could be changed from Friday to another day, such as Tuesday. Groskopf and T.J. were both disappointed to find that this could not be done. Groskopf would not recommend that anyone, particularly a pregnant woman, walk or hitchhike the three miles or so that T.J. needed to go to visit S.J.
*469 T.J. testified on her own behalf. She had known N.B. for six years and had lived with him while he was not incarcerated. She was currently receiving public assistance and food stamps, but did not work because she could not pay for child care.
T.J. stated that she had not used cocaine since before S.J. was born. After S.J. was born, T.J. participated in the LCHD's inpatient "detox" program, but left after seven days because she was concerned about her children; although N.B. was living with her, he had to work as well as watch the children. In the summer of 1989, T.J. attended about seven Alcoholics Anonymous meetings. After the court informed her that Alcoholics Anonymous was not appropriate therapy, T.J. began therapy under Amy Tsuji's supervision in April 1990.
T.J. explained that her apartment burned down in mid-December 1989, after which she lived in Waukegan hotels for about three weeks. About two months before Easter 1990, she next moved in with an older friend, Robert Askew, in North Chicago. For part of this time, she was receiving no public assistance. As she had no driver's license in all this time, she relied on Askew to drive her to court appearances. Askew charged about $40 per month for this service. When she was not receiving public assistance, Askew would not drive her anywhere.
When subsidized housing became available in Round Lake Beach, T.J. moved there. After the move, she initially received a few rides to the LCHD from the homemaker, but the homemaker refused to continue providing transportation because T.J.'s children were not coming along. Robert Askew took her a few times, at a charge of $10 per round trip.
T.J. recalled that after she was discharged from therapy with Amy Tsuji in August 1990 she did not follow Tsuji's recommendation for inpatient treatment. She did call Tsuji to get reinstated. The two set up an appointment which T.J. missed because she had no transportation. When they met again, Tsuji told T.J. that T.J. might get back into the program if she showed Tsuji "some responsibility"; T.J. asked Tsuji to help her by signing a transportation request form that T.J. had obtained from Public Aid. Tsuji refused because T.J. had yet to "show responsibility." T.J. testified that without the requested transportation she had no means to get to Waukegan at the time.
T.J. then contacted Scott Gielow at Lake Villa and eventually gained admission to the drug therapy program there. Since then, she had been attending counseling regularly twice a week. Public Aid paid for her taxi rides there.
T.J. testified that she had given up both cocaine and marijuana. Although she had been smoking marijuana since early adolescence, she now realized it was not good for her. T.J. admitted that N.B. had never seen her marijuana use as a problem. However, she would no longer live with N.B. and would not let him use marijuana on any occasions that he might visit her house. T.J. stated that the Lake Villa program performed random urinalyses, though generally only on her visits there.
At first T.J. did not send S.J. any presents. However, she and N.B. sent their baby a rocking horse for Christmas 1989, and, in July 1990, T.J. gave S.J. birthday gifts, including bluejeans and several outfits. T.J. testified that in December 1990 she bought S.J. some Christmas gifts but did not send the gifts because Debra Perez had returned gifts that T.J. had sent earlier; T.J. stated that late in 1990 CC gave her the impression that she might have S.J. returned if T.J. tested negative for marijuana. T.J. was unable to provide urine samples because she had been discharged from therapy and could not afford private testing.
T.J. admitted that between late summer 1989 and the end of March 1990 she seldom visited S.J. even though Betty Rucker and other caseworkers told her how important these visits were to reuniting S.J. with respondents. However, T.J. testified, during this period her public assistance was being withheld because she owed money in an unspecified lawsuit. At this time, she could not pay Robert Askew to take her to S.J. On cross-examination, T.J. explained *470 her long absence was because she did not understand "why come everything was really going the way it was happening" and that when she had been visiting S.J. once a week, "it would be upsetting every time I would see her and have to leave her." T.J. could not explain why, in the period she was living in Waukegan motels, she could not take a cab to see S.J.
Between April and October 1990, T.J. saw S.J. more regularly. At first, visitation was at the CC office in Waukegan, and Robert Askew drove T.J. there. Later in this period, the visits were at T.J.'s home, with Debra Perez bringing T.J. over. In October 1990, visits were moved back to the CC Waukegan office. T.J. testified that after this move she stopped visiting S.J. because "they stated that [S.J.] was being emotionally disturbed, and if she was * * * I didn't want to be hurting her like that." Also, she was "up in Round Lake" by herself and had no transportation (public or otherwise) to Waukegan. Merlean Lovelady took T.J. to the CC office a couple of times, and she and T.J. discussed transportation. Lovelady was unable to get visitations at CC changed from Fridays to Tuesdays. JoAnn Fitzgerald also could not help T.J. with transportation.
T.J. said that when S.J. visited her at home, T.J. played and watched television with S.J., let S.J. play with T.J.'s other children, and tried to calm down S.J. when the baby became upset. T.J. testified that she followed the recommendations of the caseworkers and Perez for taking care of S.J. She got along with Perez. After the "irregular incident" of August 1990, T.J.'s relationship with Perez became strained. When T.J. visited S.J. in Waukegan in November 1990, S.J. recognized her, called her "mommy," and played with T.J. However, T.J. believed that at these visits Perez was trying to make S.J. think of Perez as "mommy." T.J. and Perez had long conversations at this time about S.J., but, for reasons T.J. could not fathom, Perez had refused to talk to her in the few months before the hearing.
In December 1990, the court terminated visitation for about a week. The court then ordered visitation to take place under supervision at CC offices. T.J. was told that the change was being made because S.J. had been "emotionally disturbed" after visits. T.J. conceded that from December 1990 through March 1991 she had not visited S.J. She had regularly asked Saba Khan about T.J.'s well-being. T.J. did not visit S.J. because she did not want to continue to disturb S.J. emotionally, because T.J. was pregnant (having given birth late in May 1991) and could not walk three miles to CC, and because her other children would have been left at home unsupervised. T.J. had asked Jennifer Groskopf if visitations could be changed from Fridays to Tuesdays; Groskopf was unsuccessful, and T.J. was left without transportation.
According to T.J., N.B. regularly called her from prison to ask about S.J. and to talk with S.J. over the phone. T.J.'s phone line was disconnected late in 1990 because of the expense N.B. ran up by always calling collect. Until the hearing on the petition, T.J. was never told that she could call DCFS or CC collect. N.B. sent a few letters to T.J.'s Round Lake Beach home, inquiring about T.J. and his children.
The State recalled four witnesses in rebuttal. Merlean Lovelady testified that, after visitation was made supervised, T.J. angrily complained to her about the change. T.J. said the change was unfair because T.J. had no transportation.
Amy Tsuji testified that she did not refer T.J. to the Lake Villa program. This was because Tsuji considered T.J. a late-stage addict for whom outpatient treatment would be inappropriate. Tsuji would still consider T.J. a late-stage addict, although one early in recovery. Tsuji would not have confidence in that recovery until it lasted a year.
Saba Khan testified that after December 1990 T.J. visited S.J. only once. Aside from this visit, T.J. asked Khan only once how S.J. was doing, this time being on May 16, 1991, on one of Khan's 11 visits to T.J.'s home. On March 12, 1991, T.J. visited S.J. with the foster mother present; Khan did not notice Perez interfering with the relationship between T.J. and S.J. After it *471 turned out to be impossible to switch visitation from Friday to Tuesday, T.J. never suggested another visitation plan to Khan.
JoAnn Fitzgerald testified that Debra Perez was present for many of the supervised visits between April and September 1990. Fitzgerald never saw Debra Perez interfere with T.J.'s visitation with S.J.
After argument, the court held that the State had proved by clear and convincing evidence that N.B. was unfit in all respects alleged by the petition. The court held there was insufficient proof that T.J. was "habitually addicted to drugs" for at least a year before the petition (Ill.Rev.Stat. 1989, ch. 40, par. 1501(D)(k)), but that the State had proved the other allegations of T.J.'s unfitness.
In explaining her findings, the trial judge initially acknowledged that, after about the end of 1989, both respondents faced difficulties in visiting S.J.: T.J. lacked regular transportation from Round Lake Beach, and N.B. was incarcerated for much of the period. Therefore, the judge focused on respondents' behavior during the first six months after the neglect adjudication.
The court stressed that during this period both parents lived a convenient distance from CC's office; yet, despite being told repeatedly of the importance of visitation, neither bothered to visit S.J. from September through December 1989. N.B. visited S.J. only at the August 7, 1989, meeting at CC headquarters, at which time he announced that he would not cooperate any further with DCFS' program. Moreover, N.B. did not get in touch with DCFS or CC after his first incarceration. Both parents had trouble making scheduled court appearances. The judge commented, "[respondents] don't take a lot of action with regard to the rest of the world. People do things for them."
The judge found that respondents' conduct after the first six months was also unsatisfactory. She concluded that T.J. visited S.J. only when S.J. was brought to her or when T.J. was transported to her child. The judge concluded that T.J. had not made reasonable progress toward the return of S.J. within the reasonable period of 12 months given her by statute (Ill.Rev. Stat.1989, ch. 40, par. 1501(D)(m)).
The judge recognized that after T.J. moved to Round Lake Beach T.J. had to travel three miles to visit S.J.; however, the judge concluded that T.J. "easily abandoned" her efforts at visitation "when faced with having to transport three miles. My God, that's a basic thing for people to take care of, and if you can't get a way, then walk it. Three miles is not long compared to what it could have been."
The judge also stated that N.B. had done nothing toward obtaining a drug evaluation or therapy and that N.B. had made slight but not reasonable attempts at visitation. The judge credited Jennifer Groskopf's testimony to the extent that it showed that the State did not prove T.J. had been addicted to drugs for the year preceding the hearing. However, the judge considered T.J.'s failure to follow through with treatment after the November 1990 discharge, as well as T.J.'s failure to continue with visitation after it was moved from T.J.'s home late in 1990, as evidence that T.J. had not made satisfactory progress toward the return of S.J. The judge found it "outrageous that Miss Grosskoff [sic] made the call to change visitation, something [T.J.] could have done on her own." The court stated that T.J. had behaved "like a lump for the whole time in failing to take action."
On June 7, 1991, the court entered a written order embodying its findings that respondents were unfit. On July 15, 1991, the court entered a written order finding that it was in the best interests of S.J. that respondents' parental rights be terminated. The court therefore gave DCFS the power to consent to the adoption of S.J. Respondents both appealed.
Each respondent argues that the trial court's finding that he or she was unfit was against the manifest weight of the evidence. Because the termination of parental rights is an extraordinarily serious measure, the State must prove the requisite unfitness by clear and convincing evidence. (Santosky v. Kramer (1982), 455 *472 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599; In re Adoption of Syck (1990), 138 Ill.2d 255, 274-75, 149 Ill.Dec. 710, 562 N.E.2d 174.) In determining whether a child's biological parents are unfit, the trial court is not to evaluate the "best interests of the child," i.e., whether foster or adoptive parents can provide the child a better home life than could the biological parents. (Syck, 138 Ill.2d at 276, 149 Ill.Dec. 710, 562 N.E.2d 174; In re Paul (1984), 101 Ill.2d 345, 354-55, 78 Ill.Dec. 149, 461 N.E.2d 983.) It is only after the parents have been adjudicated unfit that such comparisons are permissible. Syck, 138 Ill.2d at 276, 149 Ill. Dec. 710, 562 N.E.2d 174; Paul, 101 Ill.2d at 354-55, 78 Ill.Dec. 149, 461 N.E.2d 983.
A reviewing court will not reverse a trial court's finding of parental unfitness unless that finding is against the manifest weight of the evidence. (Syck, 138 Ill.2d at 274, 149 Ill.Dec. 710, 562 N.E.2d 174; In re Clarence T.B. (1991), 215 Ill.App.3d 85, 100-01, 158 Ill.Dec. 765, 574 N.E.2d 878.) Each case concerning parental unfitness is sui generis, and factual comparisons between cases are inherently suspect. Syck, 138 Ill.2d at 279, 149 Ill.Dec. 710, 562 N.E.2d 174; Clarence T.B., 215 Ill.App.3d at 101, 158 Ill.Dec. 765, 574 N.E.2d 878.
N.B. argues that the trial court erred in finding him unfit. He does not deny that he did not cooperate with DCFS and did not make most of the scheduled visits with S.J. However, he points out that for most of the period at issue he was incarcerated and thus unable to visit his child. Also, he claims that his frequent telephone contacts with T.J. and S.J. demonstrate his interest and concern for his child. We disagree.
We hold first that the court properly found that N.B. failed to maintain a reasonable degree of interest, concern or responsibility as to S.J.'s welfare (Ill.Rev.Stat. 1989, ch. 40, par. 1501(D)(b)). Our supreme court has stated:
"[I]n determining whether a parent showed reasonable concern, interest or responsibility as to a child's welfare, we have to examine the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred[,] * * * [such as] the parent's difficulty in obtaining transportation to the child's residence [citations], the parent's poverty [citation], the actions and statements of others that hinder or discourage visitation [citation], and whether the parent's failure to visit the child was motivated by a need to cope with other aspects of his or her life or by true indifference to, and lack of concern for, the child [citation]. If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending on the content, tone, and frequency of those contacts under the circumstances. [Citations.] * * * [A] court is to examine the parent's efforts to communicate with and show interest in the child, not the success of those efforts." Syck, 138 Ill.2d at, 278-79, 149 Ill.Dec. 710, 562 N.E.2d 174.
We grant that N.B. was incarcerated for much of the period at issue and that the record shows that he made some efforts to visit or show an interest in S.J. Nonetheless, the trial court properly found that N.B.'s interest, concern and responsibility were not reasonable under the circumstances.
As the trial court noted, N.B. was not incarcerated until December 22, 1989, about six months after the birth of S.J. On August 7, 1989, while visiting his child, he stated that he would refuse to cooperate with DCFS or CC any further. True to his word, N.B. missed the August 10, 1989, neglect adjudication and every scheduled visitation.
We recognize that N.B. failed to visit S.J. or cooperate with DCFS because he was trying to avoid arrest and imprisonment on an outstanding warrant. This excuse might negate an inference that N.B. had no subjective interest in or concern for the well-being of his child during the latter part of 1989. However, it does not show (and N.B. does not appear to argue on appeal) that N.B. demonstrated a reasonable *473 level of interest, concern and responsibility for his infant daughter.
Lest there be any confusion, we state plainly that we do not consider N.B.'s desire to escape arrest the sort of mitigating circumstance discussed in Syck. Public policy requires that a parent not be able to turn his desire to evade justice into a valid excuse for his failure to pay crucial (and statutorily required) attention to his neglected child.
In addition to evidence that N.B. failed to visit or otherwise show concern for S.J. before he went to prison in December 1990, there was ample evidence that he failed to show a reasonable level of interest in S.J. after he was released. Although N.B. was present at a few visits and apparently related well to S.J. on those occasions, he concededly missed 11 scheduled visits in a period of slightly over two months. At the hearing, N.B. could offer no excuse for missing these visits.
Finally, there was no evidence that N.B. had found gainful employment or even tried to do so; at the time of the hearing, he was back in prison. Assuming arguendo that N.B.'s telephone calls and cards from prison were all that he could reasonably do while he was incarcerated, the evidence of how N.B. conducted himself while he was not in prison was sufficient for the trial court to conclude that he had not shown reasonable concern, interest or responsibility as to S.J.'s welfare. As we conclude that the trial court properly found N.B. unfit on this basis, we need not review its findings of unfitness on other statutory grounds. See, e.g., In re L.L.S. (1991), 218 Ill.App.3d 444, 445, 160 Ill.Dec. 804, 577 N.E.2d 1375.
We hold, however, that the trial court's finding that T.J. was unfit was against the manifest weight of the evidence. In reversing the trial court, we reemphasize that "[p]recisely because of the devastating effect produced by a termination of parental rights, the evidence of a parent's unfitness has to be clear and convincing." (Syck, 138 Ill.2d at 275, 149 Ill. Dec. 710, 562 N.E.2d 174.) We focus primarily on those considerations that the trial judge gave as the basis for her factual findings.
As noted earlier, whether a parent has shown reasonable interest, concern or responsibility for her child must be measured by the parent's efforts, not the success of those efforts, and in the context of various potentially mitigating circumstances. We believe that the mitigating circumstances listed in Syck are particularly strong here. The evidence was undisputed that T.J. had a limited education, slight employment prospects, a number of children other than S.J. who required her attention (particularly when N.B. was incarcerated), and limited transportation from her home to CC offices or to drug treatment.
The record does not show that T.J. ever had a strong social network, or even dependable help from any friends or relatives, to help her with the tasks assigned her. Indeed, T.J. told JoAnn Fitzgerald that she had moved out of North Chicago to escape people who were a "bad influence" on her family. First, T.J.'s decision to move is probative of her concern for providing herself and her children with a relatively benign environment, and second, because her move represented an honest effort to provide a suitable home for her family at the first available opportunity, her subsequent difficulties in finding transportation from her Round Lake Beach home were not (unlike N.B.'s problems with the law) of her own making.
With this background in mind, we cannot accept the trial court's conclusion that T.J.'s visitation record demonstrated, by clear and convincing evidence, a lack of reasonable concern for S.J. Several considerations persuade us that the court's finding is against the manifest weight of the evidence.
First, as late as December 3, 1990, T.J. was, according to CC, progressing "satisfactorily" with visitation. She regularly visited with S.J. for most of 1990. The trial court stressed (and the State stresses on appeal) that T.J. fulfilled visitation requirements primarily when S.J. was brought to her house. However, the failure *474 to visit a child is not proof of unfitness if the parent offers a reasonable explanation. (In re Jason U. (1991), 214 Ill.App.3d 545, 552, 158 Ill.Dec. 296, 574 N.E.2d 90.) Such an explanation may include steps by DCFS making visitation more difficult. Jason V., 214 Ill.App.3d at 553, 158 Ill.Dec. 296, 574 N.E.2d 90.
Aside from the difficulty of finding transportation three miles while her four children were unattended at home, the record shows that DCFS shifted visitation largely because of a single incident in which T.J. returned S.J. late to CC. This shift made visitation more difficult, to the point where DCFS acknowledged its mistake and, on November 8, 1990, changed visitation back to the home. As of December 3, 1990, DCFS and JoAnn Fitzgerald rated T.J.'s progress on visitation "satisfactory." As of the time of the hearing, DCFS still hoped to reunite T.J. with S.J.
In this context, deference to the trial court as the fact finder does not require us to accept the court's highly questionable reasoning on the issue of visitation. The court placed emphasis on the fact that Jennifer Groskopf, rather than T.J. herself, requested that visitation be changed from Fridays to Tuesdays. However, the evidence shows that Groskopf made this request at T.J.'s initiativeafter T.J. had made similar requests unsuccessfully. We fail to see how this fact is at all probative of a lack of interest in S.J.
More crucially, in commenting on T.J.'s failure to walk three miles for visits after visitation was resumed at the end of 1990, the trial judge assumed that such a task was no major impediment for a pregnant woman with four children at home. Aside from its inherent implausibility, this assumption was undercut by at least one witness' testimony that it would be unreasonable to demand this behavior of anyone, pregnant or not.
The trial court cited (and the State cites on appeal) In re T.R. (1985), 135 Ill.App.3d 1017, 90 Ill.Dec. 553, 482 N.E.2d 372, and In re N.H. (1988), 175 Ill.App.3d 343, 125 Ill.Dec. 39, 529 N.E.2d 1115, cases decided under vastly distinguishable circumstances. In T.R., the respondent father utterly failed to visit his child for approximately 2½ years. There was no indication that he lacked transportation and less credible evidence than here that DCFS frustrated his efforts at visitation.
In N.H., the respondent father went two years without even attempting to contact his children and a further length of time without visiting them. The respondent lived by himself in a trailer and refused to walk 45 minutes to the visits. There was no indication that he was disabled. His situation cannot reasonably be equated with that of a pregnant woman with children at home. Like T.R., N.H. is easily distinguishable.
Although these cases are distinguishable on their facts, we accept their reasoning. In this regard, we note that the court in N.H. stressed that in deciding whether missed visitations demonstrate a parent's lack of interest in his or her child, a court should consider the parent's conduct during the entire period of time in question. (N.H, 175 Ill.App.3d at 346, 125 Ill.Dec. 39, 529 N.E.2d 1115.) Thus, T.J.'s failure to visit S.J. late in 1989 or very early in 1990, although entitled to consideration, is far from decisive.
Besides T.J.'s substantial efforts at visitation and her plausible explanation for most of her absences, the record reveals that she spent some of her limited income on gifts and toys for S.J. and that she made substantial efforts to make her home suitable for her daughter. All in all, we simply cannot uphold the trial court's finding that there was clear and convincing evidence that T.J. failed to demonstrate a reasonable level of concern, interest or responsibility for S.J.
We turn next to the court's findings that T.J. was unfit in that she failed to make reasonable efforts to correct the conditions which were the basis for the original adjudication of neglect and that she failed to make reasonable progress toward the return of S.J. to her within 12 months of the neglect adjudication (Ill.Rev.Stat. 1989, ch. 40, par. 1501(D)(m)). These criteria are independent bases for a finding of *475 unfitness. Applying the "reasonable efforts" standard involves a subjective judgment based upon the amount of effort reasonable for the particular person; deciding whether a parent has made "reasonable progress" toward the return of the child involves an objective judgment based upon progress measured from the conditions existing when the parent was deprived of custody. In re L.L.S. (1991), 218 Ill.App.3d 444, 458-59, 160 Ill.Dec. 804, 577 N.E.2d 1375; In re S.G. (1991), 216 Ill.App.3d 668, 669-70, 159 Ill.Dec. 125, 575 N.E.2d 932; In re Allen (1988), 172 Ill.App.3d 950, 956, 123 Ill.Dec. 184, 527 N.E.2d 647.
The first of these two criteria specifically requires a court to evaluate whether a parent has made "reasonable efforts to correct the conditions which were the basis of the removal of the child from such parent." (Emphasis added.) (Ill.Rev.Stat.1989, ch. 40, par. 1501(D)(m).) This poses a special problem for the State under the circumstances here. The condition that was the basis of the removal of S.J. was her birth with cocaine in her system. Such a condition can happen only once. Nothing T.J. could have done after the neglect adjudication would have corrected this condition, and nothing she could have done would have brought about the recurrence of this unique event.
Even if the "conditions which were the basis of the removal of the child" are defined more broadly as T.J.'s drug abuse, we cannot agree with the trial court that there was clear and convincing evidence that T.J. failed to make reasonable efforts to correct this problem. All the relevant evidence at the hearing was that T.J. had given up cocaine before the birth of S.J. All of her tests were negative for cocaine and her most recent child was born cocaine-free.
Moreover, the trial judge herself found Jennifer Groskopf a credible witness, at least to the point of acknowledging that Groskopf's counseling apparently "enabled" T.J. to give up any addictions. Although T.J. did not succeed with her early therapy sessions, she took the initiative to enroll in the Lake Villa program and attended regularly once transportation was available. Her last two urine tests were negative for all drugs.
To uphold the trial court's finding of no "reasonable efforts" would effectively allow the court to terminate T.J.'s parental rights because she had smoked marijuana after the birth of her child. We recognize that marijuana is a controlled substance and do not intend to condone its possession or use. However, we do not believe that T.J.'s conduct relating to the use or possession of marijuana in the case before us should suffice as a basis for judicial action as sweeping and devastating as the termination of a parent's rights in her child. In any event, the statute cannot fairly be read to allow such a result, at least under the facts of this case.
We turn finally to the trial court's finding that T.J. failed to make reasonable progress toward the return of the child within 12 months of the neglect adjudication (Ill.Rev.Stat.1989, ch. 40, par. 1501(D)(m)).
Although the statute could be interpreted to give a parent only 12 months in which to make "reasonable progress," the weight of recent authority is that 12 months is the minimum period in which a parent has to make reasonable progress; therefore, in evaluating whether a parent has made reasonable progress, the trial court should consider the parent's conduct during the entire period after the neglect adjudication. (In re C.R. (1991), 221 Ill. App.3d 373, 381, 163 Ill.Dec. 779, 581 N.E.2d 1202; In re Jason U. (1991), 214 Ill.App.3d 545, 552, 158 Ill.Dec. 296, 574 N.E.2d 90; In re A.T. (1990), 197 Ill.App.3d 821, 830-31, 144 Ill.Dec. 283, 555 N.E.2d 402; In re R.S. (1988), 174 Ill.App.3d 132, 133-34, 123 Ill.Dec. 641, 528 N.E.2d 25.) We are therefore troubled by the trial judge's heavy emphasis on (and quotation at length from) In re E.J.F. (1987), 161 Ill.App.3d 325, 330, 112 Ill.Dec. 881, 514 N.E.2d 544, which apparently held that 12 months from the neglect adjudication is all the time a parent has to make reasonable progress. From our reading of the transcript, it appears that the trial judge considered (as the parties agreed the court *476 should) the evidence of T.J.'s conduct over the entire period between the neglect adjudication and the hearing on the petition. In reviewing the court's decision, we shall assume the judge applied the more recent standard, and we shall also consider T.J.'s conduct during the full period between the neglect adjudication and the termination hearing.
More difficult is defining how the trial court is to measure whether a parent has made "reasonable progress." The appellate court has stated regularly that "reasonable progress" requires, at a minimum, demonstrable movement toward the goal of the return of the child. (See, e.g., In re M.S. (1991), 210 Ill.App.3d 1085, 1093, 155 Ill.Dec. 671, 569 N.E.2d 1282; In re Austin (1978), 61 Ill.App.3d 344, 350, 19 Ill.Dec. 37, 378 N.E.2d 538.) However, the court has not always applied the same criteria for measuring progress.
A number of decisions, including ones of this court, have stated that the benchmark for measuring such progress is the situation which triggered the initial removal of the child (In re A.H. (1991), 215 Ill.App.3d 522, 530, 159 Ill.Dec. 32, 575 N.E.2d 261; In re S.D. (1991), 213 Ill.App.3d 284, 290, 157 Ill.Dec. 143, 571 N.E.2d 1162; In re M.W. (1990), 199 Ill.App.3d 1050, 1056, 146 Ill.Dec. 17, 557 N.E.2d 959; In re Bennett (1980), 80 Ill.App.3d 207, 212, 35 Ill.Dec. 669, 399 N.E.2d 735; In re Austin (1978), 61 Ill.App.3d 344, 350, 19 Ill.Dec. 37, 378 N.E.2d 538) or the conditions in existence when custody was taken from the parents (In re S.G. (1991), 216 Ill.App.3d 668, 669-70, 159 Ill.Dec. 125, 575 N.E.2d 932; In re M.C. (1990), 201 Ill.App.3d 792, 798, 147 Ill.Dec. 236, 559 N.E.2d 236; In re Perez (1988), 173 Ill.App.3d 922, 930, 123 Ill.Dec. 693, 528 N.E.2d 238).
However, in In re L.L.S. (1991), 218 Ill. App.3d 444, 160 Ill.Dec. 804, 577 N.E.2d 1375, the Appellate Court, Fourth District, held that the standard by which progress is to be measured is whether the parent's compliance with the court's directives, DCFS service plan or both is such that the court will be able to return the child to the parent in near future. Trial court directives and service plans should be geared to remedying parental deficiencies that, if not remedied, will prevent the child from being returned to the parent's custody; evidence of the precise conditions at the time of the neglect adjudication is not essential to a determination of whether the parent has made reasonable progress. L.L.S., 218 Ill.App.3d at 462-64, 160 Ill.Dec. 804, 577 N.E.2d 1375.
The divergence is potentially significant to a case such as the one here. At least if read mechanically, the L.L.S. standard might adequately support the trial court's decision. It is undisputed that T.J. did not comply with much of what various agencies requested of her, including inpatient drug treatment, certain of the scheduled visits, and enrollment in parenting classes. Also, although JoAnn Fitzgerald rated T.J.'s progress on visitation satisfactory as of early December 1990, the evidence was that S.J. was uncomfortable both before and after the visits of late 1990, implying that realization of the goal of reunification may have been a prospect for the long term at best.
We decline to follow such an approach, however. For several reasons, we continue to hold that the crucial consideration is the actual progress made from the conditions at the time of the neglect adjudication. (In re S.G., 216 Ill.App.3d at 669-70, 159 Ill.Dec. 125, 575 N.E.2d 932.) First, L.L.S. recognizes that compliance with DCFS service plans is a means to a desired end, not the end in itself; thus, although we have held that the conditions imposed upon a parent whose child has been adjudicated neglected need not relate to the specific facts that led to the neglect adjudication (In re Perez (1988), 173 Ill.App.3d 922, 930-31, 123 Ill.Dec. 693, 528 N.E.2d 238), even L.L.S. states that DCFS service plans ought to be directed, primarily at least, at the parental deficiencies that led to the initial removal of the child. (L.L.S., 218 Ill.App.3d at 465-66, 160 Ill.Dec. 804, 577 N.E.2d 1375.) A parent might succeed at reaching a goal envisioned by DCFS without following DCFS' specific directives. In this case, for instance, the weight of the *477 evidence at the hearing was that T.J. early succeeded in ceasing her use of cocaine even though she was discharged from her initial therapy, did not obtain inpatient treatment as recommended, and enrolled in a program not recommended by her original counselor. To hold that her failure to comply with the specifics of the service plans in this regard is probative of her lack of reasonable progress would unfairly and irrationally elevate administrative means over statutory ends.
Second, to place undue emphasis on compliance with service plans would raise the danger of a form of "bootstrapping" under which a parent could lose her rights to her children because she failed to do things that were not necessarily related to her previously established shortcomings as a parent. Here, for example, T.J.'s failure to take parenting classes should not be given great weight where (1) any lack of "parenting skills" as such was not the reason for the initial neglect adjudication; (2) she was never shown, at the initial adjudication, to have lacked these parenting skills; (3) the weight of the evidence was that she kept her house satisfactorily furnished and cared responsibly for the children in her custody; and (4) the vast majority of parents are never required by the State to take parenting classes.
To the extent that we may have held differently earlier (see In re Perez, 173 Ill.App.3d at 928-29, 123 Ill.Dec. 693, 528 N.E.2d 238), we choose to depart from this earlier holding under the particular facts of this case. We note that Perez does hold that evidence of the conditions triggering the initial adjudication is essential to a determination of whether a parent has made "reasonable progress." Also, Perez relies in part on the assumption that the best interests of the child are the "paramount consideration" in the construction of section 1(D)(m) of the Adoption Act. (Perez, 173 Ill.App.3d at 928, 123 Ill.Dec. 693, 528 N.E.2d 238.) We must view this reasoning as highly suspect at best, given the unequivocal pronouncements of our supreme court that a trial court is not to consider what would serve the "best interests of the child" until after the trial court has found, by clear and convincing evidence, that the parent or parents are unfit as defined by a provision such as section 1(D)(m). Syck, 138 Ill.2d at 276-77, 149 Ill.Dec. 710, 562 N.E.2d 174; Paul, 101 Ill.2d at 354-55, 78 Ill.Dec. 149, 461 N.E.2d 983.
Third, this court has recently held that although the goal of reunification is relevant to the "reasonable progress" standard, "[t]he inability to nurture or interact is not a proper statutory basis for the removal of children in this State." (Emphasis in original.) (S.G., 216 Ill.App.3d at 671, 159 Ill.Dec. 125, 575 N.E.2d 932.) Thus, where a parent has made substantial progress toward correcting the condition that led to the removal of the child, the lack of what DCFS deems satisfactory interaction between parent and child is not justification for the termination of parental rights. S.G., 216 Ill.App.3d at 671, 159 Ill.Dec. 125, 575 N.E.2d 932.
By thus holding, we do not mean to imply that a parent's failure to follow DCFS service plans or court directives is necessarily irrelevant to an evaluation of whether that parent has made "substantial progress" under the statute. We simply emphasize that the ultimate issue is the reasonableness of the progress that the parent has made, in light of all the circumstances, in moving beyond the parental deficiencies that led to the initial removal of the child. This is simply a restatement of the holdings of numerous cases cited above. To place compliance with DCFS plans ahead of the ultimate fact of progress would be to let the tail wag the dog. In a matter as serious as the termination of parental rights, we choose to avoid such a mechanical approach. Also, a parent's failure to comply with court directives and DCFS service plans is still relevant to other criteria of unfitness, such as a lack of reasonable concern for the child's welfare or a failure to plan for the child's future (Ill.Rev.Stat.1989, ch. 40, pars. 1501(D)(b), (D)(n)). Thus by our holding in this case we do not intend to deprive DCFS and relevant social service agencies of their proper role in parent-child relations; we only seek to clarify that role in *478 the context of a parental rights termination proceeding.
In the case at bar, the situation that triggered the removal of S.J. was the birth of the child with cocaine in her systemor arguably the mother's use of cocaine and other mood-altering drugs. We know little else about the relevant conditions at the time of the neglect adjudication. Other than the facts that S.J. was born with cocaine in her system, that T.J. had had a previous "cocaine baby," and that T.J. admittedly used cocaine for some time prior to the neglect adjudication, there is little record evidence of the general conditions surrounding the initial neglect adjudication. Based on the facts that we have earlier reviewed, we hold that the trial court's finding that T.J. failed to make reasonable progress toward the correction of the conditions that led to the removal of S.J. was against the manifest weight of the evidence.
A court may terminate the parental rights of one parent while preserving those of the other parent. (See, e.g., In re S.M. (1991), 219 Ill.App.3d 269, 277, 162 Ill.Dec. 343, 579 N.E.2d 1157; In re T.R. (1985), 135 Ill.App.3d 1017, 1020-21, 90 Ill. Dec. 553, 482 N.E.2d 372; In re Perez (1988), 173 Ill.App.3d 922, 123 Ill.Dec. 693, 528 N.E.2d 238.) We therefore affirm that part of the trial court's judgment adjudging N.B. unfit and terminating N.B.'s parental rights in S.J. We reverse that part of the order adjudging T.J. unfit and terminating her parental rights in S.J. As one parent retains her parental rights, we necessarily also reverse the trial court's order giving DCFS the power to consent to the adoption of S.J. S.J. therefore remains a ward of the court.
The judgment of the circuit court of Lake County is affirmed in part and reversed in part.
Affirmed in part; reversed in part.
NICKELS, J., concurs.
Presiding Justice INGLIS, dissenting:
I respectfully dissent. Our task in reviewing cases of parental unfitness is limited to determining whether the trial court's decision was against the manifest weight of the evidence. (In re Adoption of Syck (1990), 138 Ill.2d 255, 274, 149 Ill.Dec. 710, 562 N.E.2d 174.) We are not to substitute our judgment for that of the trial court, but we are to decide whether there was sufficient evidence to justify the trial court's judgment. In my opinion, the evidence supports the conclusion of the trial court.
The trial court found that T.J. was an unfit parent because T.J. failed to maintain a reasonable degree of interest, concern or responsibility as to S.J.'s welfare (Ill.Rev. Stat.1989, ch. 40, par. 1501(D)(b)). The trial court also found that T.J. failed to make reasonable efforts to correct the conditions which were the basis for removing S.J. from T.J.'s custody or failed to make reasonable progress toward the return of S.J. within 12 months after S.J. was adjudicated a neglected minor (Ill.Rev.Stat.1989, ch. 40, par. 1501(D)(m)). I will focus my discussion on the trial court's latter finding as I believe the evidence strongly supports that determination.
S.J. was removed from T.J.'s parental custody in August 1989, one month after being born a "cocaine baby." At the hearing which found S.J. to be a neglected minor, the court ordered T.J. to participate, among other things, in parenting classes, participate and complete a substance abuse treatment program and refrain from ingesting any illegal substances. T.J. has not reasonably progressed in any of these areas. According to JoAnn Fitzgerald's June 29, 1990, progress report, T.J. had not participated in parenting classes, although she was progressing toward providing housing and support for S.J. Fitzgerald's July 26, 1990, report stated that T.J. was doing poorly with drug rehabilitation. T.J.'s urine samples tested positively for marijuana. She missed therapy sessions because she "didn't feel like going." In August 1990, T.J. told Fitzgerald that she used marijuana to help her relax when her children strained her nerves. T.J.'s ambivalence toward drug rehabilitation continued *479 until DCFS filed a petition to terminate T.J.'s parental rights in November 1990.
After the petition to terminate parental rights was filed, T.J. began to make an effort in drug treatment. She attended outpatient treatment in February 1991 and twice tested negatively for drugs. Jennifer Groskopf testified that T.J. attended nine weekly counseling sessions between March and May 1991. Groskopf testified that as of the hearing in May 1991, T.J. was "drug-free" and she had no concern that T.J. would suffer a relapse. Amy Tsuji, a drug counselor at the Lake County Substance Abuse Clinic, considered T.J. to be a "late-stage addict." Tsuji testified that she would not be confident that T.J. had recovered until treatment had lasted one year.
The majority states that the condition under which S.J. was removed from T.J.'s custody was S.J.'s birth with cocaine in her system, which occurred only once. I believe this is an overly narrow view of the problem. T.J.'s pattern of abusing drugs was the reason that S.J. was adjudicated a neglected child. The trial judge found, based on the evidence, that T.J. did not make a reasonable effort or reasonable progress within a 12-month period in controlling her behavioral pattern of using drugs. The majority believes that T.J.'s marijuana use should not be a basis for terminating her parental rights. However, that fact, along with T.J.'s refusal to attend parenting classes and to seek drug treatment until after the termination petition had been filed, was sufficient evidence to support the trial court's decision to terminate parental rights. Any other finding would necessitate the reweighing of evidence, which is beyond the power of this court.