2020 IL App (2d) 200248-U
No. 2-20-0248
Order filed July 13, 2020

**NOTICE**: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* L.N., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 17-JA-394 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis Martinez, |
| Appellee v. Jamelia H., Respondent-Appellant). | ) | Judge, Presiding. |

| | | |
|---|---|---|
| *In re* Z.N., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Winnebago County. |
| | ) | |
| | ) | No. 17-JA-395 |
| | ) | |
| | ) | Honorable |
| (The People of the State of Illinois, Petitioner- | ) | Francis Martinez, |
| Appellee v. Jamelia H., Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1 *Held*: The appellate court affirmed termination of respondent's parental rights where the trial court's finding that respondent was an "unfit person" under section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2018)) was not against the manifest weight of the evidence.

¶ 2 On March 10, 2020, the trial court found respondent, Jamelia H., to be an unfit person (750 ILCS 50/1(D)(m) (West 2018)) and determined that it was in the best interests of her daughter, Z.N., and son, L.N.[1], to terminate her parental rights (705 ILCS 405/2-29 (West 2018)). Respondent appealed. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4 In April 2017, Z.N. was four years old and L.N. was seven months old. Respondent called the Department of Children and Family Services (DCFS) hotline and reported that she (1) was unable to care for herself or her children, (2) was afraid that the father of one of her children would return to harm them, (3) had a disability, (4) had little food in the home, and (5) was facing eviction. DCFS later learned that the police were called to respondent's home in January 2017 for a domestic disturbance when Markeeon N., father of L.N., purportedly pointed a gun at respondent in the presence of Z.N. and L.N. In June 2017, respondent agreed to "intact family" services.

¶ 5 On December 22, 2017, the State filed neglect petitions pursuant to section 2-3 of the Juvenile Court Act of 1987 (705 ILCS 405/2-3 (West 2016)), alleging that Z.N. and L.N. were neglected in that (1) they were minors whose environment was injurious to their welfare due to their exposure to domestic violence, and (2) they were not receiving proper support, education, medical care, or adequate food, clothing, and shelter.

¶ 6  On May 7, 2018, respondent stipulated to an amended count I of the neglect petition, which alleged that "there is a history of domestic violence in the home," rather than "mother has a history of domestic violence." On that same day, the trial court adjudicated the minors neglected based on respondent's stipulation and entered an order to that effect.

---

[1] L.N. is also referred to as N.H. in the record, which reflected an apparent error on his original birth certificate. We refer to him as L.N. throughout this disposition.

¶ 7  On July 11, 2018, with respondent, Markeeon N., and Tommy N. (father of Z.N.) present, the court entered an agreed dispositional order whereby guardianship and custody was granted to respondent with the proviso that she cooperate with all recommendations for services by DCFS for herself and her children, including counseling.

¶ 8 On July 13, 2018, a DCFS child welfare specialist (CWS) and a counselor from Youth Services Network (YSN) visited respondent in her home. Respondent's integrated assessment indicated that respondent had told a screener that she was previously diagnosed with Bipolar Disorder and Schizophrenia. Respondent repeatedly denied having told the screener of these diagnoses. The CWS described respondent as "adamant" about not completing a mental health assessment (MHA). Respondent also stated that she did not want to put Z.N. in counseling, complaining that she was only five years old and describing her as a "happy-go-lucky" kid. The CWS and counselor emphasized that respondent was required to comply with the court's order to cooperate with DCFS's recommendations for services. It also came to the CWS's attention that respondent's adult brother was living in the home. The CWS told respondent that he could not live there because no background investigation had been conducted on him. Respondent stated that no one was going to tell her who could come into her home or who could live there.  She asked the CWS and counselor to leave.

¶ 9  On July 24, 2018, another counselor from YSN met with respondent to discuss scheduling counseling for Z.N. Respondent refused to cooperate, stating that Z.N. had never witnessed domestic violence and had no need for counseling.

¶ 10 On August 3, 2018, DCFS filed a "concern report" with the court that outlined respondent's refusal to cooperate with DCFS's recommendations. Based on the concern report, the State and guardian *ad litem* (GAL) requested a shelter care hearing. Respondent and both fathers waived

their right to a hearing. On August 9, 2018, the court entered and emergency temporary custody order granting DCFS temporary guardianship and custody with power to place the minors in foster care.

¶ 11 On August 20, 2018, the State filed a motion to modify guardianship and custody alleging that (1) respondent failed to cooperate to get counseling for Z.N., (2) on May 1, 2018, Z.N. was found walking alone at a construction site near a busy thoroughfare and that the police picked up Z.N. and waited for 30 minutes at respondent's home before she came home, (3) respondent failed to cooperate with DCFS by refusing to provide information about people living in her home, and (4) respondent failed to cooperate with DCFS to complete an MHA.

¶ 12 On November 1, 2018, the court held a hearing on the motion to modify guardianship and custody. The State presented evidence that respondent was not consistently engaging in various services. For example, the CWS testified that she informed respondent that she needed to complete an MHA and offered to provide transportation to assist in completing that requirement. The CWS stated that respondent refused the transportation and said she would not complete the MHA because that is for "crazy" people and she is not "crazy." The CWS also testified that respondent refused to provide information about other adults living in the home. As to the incident where Z.N. was found alone at a construction site, the CWS testified that it was unfounded because the mother claimed to have left the child with an adult cousin, Kira W., although the CWS was never able to reach Kira to verify this information.

¶ 13 Respondent did not testify. Even so, her attorney proffered that she was willing to put Z.N. in counseling as of August 10. Respondent's attorney further argued that the construction site incident was irrelevant because it occurred in May, two months prior to the July dispositional order, so it was not a change in circumstance that warranted a modification to the dispositional

order. Respondent's attorney further argued that it was "unconscionable to hold a victim of domestic violence accountable for the actions of a domestic abuser." The State countered that the construction site incident was relevant because it did not become aware of the incident until after the dispositional order was entered in July, and that respondent consistently refused to cooperate to obtain recommended services for her and her children, which was the change in circumstances following the agreed order.

¶ 14 The court noted that respondent failed to follow the court's orders to cooperate with DCFS:

"There's an agreement that [respondent] was fit and willing and able to properly parent these children, and then I signed an order.

\*\*\*

When I sign that order, nobody gets to say [Z.N.] doesn't need counseling. That's not in the universe [of options].

\*\*\*

You don't get to say I don't want to do it. That privilege has been removed. Even when you keep your children, that privilege has been removed, so that was inappropriate."

The court acknowledged respondent's explanation that Z.N.'s wandering unaccompanied through a construction site occurred when respondent left Z.N. in the care of an adult cousin, and, therefore, was not due to her neglect. However, the court expressed concern regarding respondent's reaction to this incident:

"[I]f I came home, and \*\*\* my five year old was with the police because she wandered down the street, I'm on the phone, and I'm like Kira, where the hell are you, and why is my child with the police?

Instead, Kira is missing. You didn't produce Kira. I don't understand why there wasn't—this wasn't gotten to the bottom of."

The court expressed further concern that respondent refused to provide DCFS with information about her adult brother living in her home, particularly when DCFS was responsible for ensuring the safety of the children:

"Why didn't you march into that bedroom and say get your butt in front of that case worker, and you give them your date of birth, your social security number, and your address, and if you can't do that, get the hell out of my house. That wasn't your response."

The court entered a new disposition order granting DCFS guardianship and custody of the children.

¶ 15 On April 23, 2019, at the first permanency review hearing, the State argued that respondent had not made reasonable efforts because she (1) was not attending counseling or responding to her counselor's efforts to coordinate counseling, (2) claimed to have attended domestic violence services but provided no documentary proof and had not signed consents, (3) had not completed parenting classes because they were delayed due to her failure to obtain other services, and (4) had missed multiple visits with Z.N. and L.N. Moreover, according to the State, respondent made questionable choices by engaging in an undisclosed romantic relationship with a man that attacked her during this review period and inflicted serious injuries upon her, and was now being charged with attempted murder for the incident.

¶ 16 The record indicates that in February 2019, respondent was involved in an ongoing two-month romantic relationship with Kameron Thrower that she had not revealed to DCFS. On February 19, 2019, respondent told police that Thrower became angry when she would not let him go through her phone. According to respondent, Thrower ripped the phone from her hands and punched her in the mouth, causing a laceration to her lip and knocking her to the ground. He then

sat on top of her, choked her, and bit her lip as she tried to get away. Police arrested Thrower for domestic battery. He was later released on a personal recognizance bond. Eight days later, on February 27, respondent returned to Thrower's home unaccompanied to retrieve certain personal items. Respondent reported that Thrower was angry because she had filed for an order of protection against him. The two got into an argument. When she tried to leave, Thrower allegedly physically retrained her and then stabbed respondent in the head, abdomen, and thigh. As a result, respondent suffered life threatening injuries and spent a number of days in the hospital. Thrower was originally charged with attempted murder and later pleaded guilty to aggravated domestic battery. Respondent reported to DCFS that she did not see any "red flags" regarding Thrower prior to the February 27 incident, nor did she believe him capable of hurting her, despite the fact that he had been arrested for physically attacking her eight days before the stabbing incident.

¶ 17 The GAL likewise argued that respondent had not made reasonable efforts, noting that respondent refused to sign consents and that she deceptively told a caseworker that she was participating in counseling when her counselor said that she was not engaged in those services.

¶ 18 Respondent argued that the State was attempting to blame her for being a victim of domestic violence.

¶ 19 The court found that respondent had not made reasonable efforts because she was not engaged in counseling and had not been forthright with her caseworker on a number of issues. It further ordered that respondent undergo an additional psychological evaluation to determine whether she had "cognitive delay," and that services may need to be reassessed following that evaluation.

¶ 20 On September 9, 2019, at the next permanency review hearing, the State noted that respondent, after missing her first appointment, eventually underwent a neuropsychological

evaluation and that there were no recommendations for additional services. The State asserted that respondent failed to attend individual counseling sessions, domestic violence groups, parenting classes, and that she had missed 6 of 18 of visits with the children during the period. Therefore, according to the State, respondent's lack of engagement in services and poor attendance at visitation indicated that she had failed to make reasonable efforts or progress during the period. The State additionally requested that the court change the goal from "return home" to "substitute care pending court determination of termination of parental rights."

¶ 21 Respondent argued that she was a victim of domestic violence, and that "the time has come for us, as a system, to respect victims of domestic violence, understand the trauma they have experienced and not be so judgmental when they don't immediately engage in services." She contended that she engaged in many of the services and that she had been to the majority of the visits with her children. Respondent proffered that she attended certain services that the State was not crediting her for, but she failed to produce supporting documentation for those services.

¶ 22 The court recognized the respondent had "upped her game" toward the end of this review period, but that it did not cure what was an otherwise poor record of participation in services. The court noted that her poor participation could not be explained by the trauma of the Thrower attack, as much of her wanton performance occurred prior to the attack and DCFS made reasonable attempts to accommodate her needs after the attack. Moreover, the court noted that respondent's "no call" or "no show" for multiple visits that the children eagerly anticipated created a situation where she was actually inflicting trauma on the children. The court entered an order finding that respondent had not made reasonable efforts or progress during the period and it changed the goal to substitute care pending court determination of termination of parental rights.

¶ 23 On September 11, 2019, the State filed motions for termination of parental rights as to Z.N. and L.N. The allegations as to respondent were identical in both motions. Count I alleged that respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children during the nine-month period from November 2, 2018, to August 2, 2019. Count II alleged that respondent failed to make reasonable progress toward the return of the children to her during the same nine-month period.

¶ 24 The court held unfitness and best interest hearings on the motions to terminate parental rights over three days in February and March of 2020. At the unfitness hearing, the State introduced a service plan that indicated that, during the nine-month period in question, respondent failed to engage in numerous services, did not attend multiple visitations without giving notice, and missed several drug tests, which were then presumed positive. The State argued that respondent continued to fail to understand the safety concerns associated with the children witnessing domestic violence. The State additionally argued that the court should find that respondent failed to engage in domestic violence services because she provided no proof of attendance. According to the State, even if she did engage in domestic violence services as proffered, she failed to learn core lessons from those services. For example, respondent began an undisclosed relationship with Thrower, a person with a publicly available history of domestic violence, after her children had been removed from her care. After Thrower violently attacked her, she returned unaccompanied to his apartment a week later, when he committed even more egregious acts of violence against her. Respondent told a caseworker that she did not see any red flags prior to the second attack and that she did not think Thrower capable of hurting her. The State also noted that the domestic violence services defendant claimed to have attended teach the victims that they must disclose any new relationships and conduct background checks to ensure

their safety. The State noted that Thrower's publicly available record indicated that three years earlier he sat on top of another woman and choked her while trying to force intercourse on her. The State argued that respondent had a poor record of engaging with services and that she had not demonstrated measurable progress during the nine-month period alleged in the motions to terminate parental rights. Therefore, according to the State, respondent failed to make reasonable efforts or progress toward correcting the deficiencies for which her children were removed from her care.

¶ 25 Respondent did not testify. Her attorney argued that the State failed to prove by clear and convincing evidence that she had not made reasonable efforts or progress in correcting the conditions that were the bases of the removal of the children. He contended that respondent self-reported her participation in domestic violence services, even if she had no documentary proof. Respondent's attorney blamed her failure to obtain counseling between April and July of 2019 on delays in the system, not her unwillingness to cooperate. Additionally, he argued that she could not engage in parenting services until the other services, such as individual counseling, were complete, but those services were delayed through no fault of her own. Moreover, argued respondent's attorney, she attended most of the visitation sessions and some of the missed visitations were due to the supervisor's cancellation. Moreover, respondent's attorney argued that her progress was reasonably impacted by the Thrower attack: "This was a brutal, vicious attack that could have ended her life. It's understandable if [respondent] did not immediately engage in the services that were expected of her. These things take time."

¶ 26 The GAL argued that respondent failed to make reasonable efforts or progress because, while it is debatable whether she attended the domestic violence services, it is "not an unreasonable expectation for her to be expected to look up the background of individuals before she get [*sic*]

into a relationship with them because that is what she is supposed to be learning." Additionally, the GAL argued that respondent knew she was supposed to disclose this relationship to her caseworker, and she chose not to do so. Moreover, much of the delay that respondent contends caused her to miss services was her own fault in that she refused to answer her door when the caseworker arrived to take her to her to the psychological evaluation.

¶ 27 The court noted that the evidence established that respondent failed to complete her parenting classes and did not engage in in any individual counseling between September 2018 and January 2019. It further noted that respondent indicated that she attended an unidentified domestic violence counseling program, but failed to offer any evidence that she had completed those services. Visits with the children were "somewhat" inconsistent, and she missed several drug tests. With regard to respondent's unfitness, the court found that the State proved both counts in the motions:

"[Respondent] has, by clear and convincing evidence, failed to make reasonable efforts to cure the conditions that led to the removal of the [children]. And as a result of those efforts not being made, she could not have made reasonable progress."

The court opined that respondent's reliance on the Thrower attack did not persuade the court that the incident created a barrier to completion of services, because respondent failed to make reasonable efforts prior to the attack and continued to fail to make efforts following the attack, even when offered accommodations. The court found that there was no evidence linking the incident to respondent's failure to make reasonable efforts.

¶ 28 On March 6, 2020, following a best interest hearing, the court terminated respondent's parental rights. Respondent timely appealed.

¶ 29                                    II. ANALYSIS

¶ 30 Respondent challenges the trial court's findings of unfitness, arguing that the State did not prove by "clear and convincing" evidence that she (1) failed to make reasonable efforts to correct the conditions that were the basis of the removal of Z.N. and L.N. from her care, and (2) failed to make reasonable progress toward the return of the children to her. The State responds that the evidence supports the court's finding of unfitness on both grounds. We agree with the State.

¶ 31 The Juvenile Court Act of 1987 sets forth the step-by-step process by which a child may be removed from his or her parents. 705 ILCS 405/1-1 *et seq*. (West 2018). Generally, when a child has been adjudicated neglected and the State seeks to free him or her for adoption without the consent of the parent, the State must establish that the parent is "unfit" under one or more grounds set forth in section 1(D) of the Adoption Act. *In re D.T.*, 212 Ill. 2d 347, 352 (2004); 750 ILCS 50/1(D) (West 2018). Parental unfitness must be based upon "clear and convincing evidence," which is greater than a preponderance of the evidence, but less than the criminal standard of beyond a reasonable doubt. *In re D.T.*, 212 Ill. 2d at 362; 705 ILCS 405/2-29(2) (West 2018). We will not reverse a trial court's finding of parental unfitness unless the finding is against the manifest weight of the evidence, which occurs when the opposite conclusion is clearly evident. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 32 In this case, the State alleged unfitness under sections 1(D)(m)(i) and 1(D)(m)(ii) of the Adoption Act, which provide:

> "(m) Failure by a parent (i) to make reasonable efforts *to correct the conditions that were the basis for the removal* of the child from the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 ***, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under

Section 2-3 of the Juvenile Court Act of 1987 ***." (Emphasis added.) 750 ILCS 50/1(D)(m) (West 2018).

¶ 33 Respondent's argument relies on her contention that the children were removed from her care only because she refused to put Z.N. into counseling. Respondent refers us to a portion of the July 22, 2019, DCFS service plan, which reads: "The case came into care due to repeated refusal of counseling services for [Z.N.]." Citing *In re S.J.*, 233 Ill. App. 3d 88 (1992), respondent contends that there was no nexus between the reasonable efforts she was required to make and the basis of the removal of her children, because her failure to engage in services had nothing to do with putting Z.N. into counseling. Respondent acknowledges that her refusal to put Z.N. into counseling was but one of four reasons the State cited in its motion seeking a new dispositional order, but she dismisses the other three as irrelevant because she contends that they were known to the State prior to the entry of the original dispositional order. The other reasons cited by the State were that (1) Z.N. was found walking alone at a construction site, (2) respondent failed to provide information to DCFS about people living in her home, and (3) respondent failed to cooperate with DCFS to complete a MHA. According to respondent, if these were known to the State prior to its agreeing to grant her guardianship and custody, then the State could not later rely on these issues as reasons to remove the children from respondent's care. Accordingly, respondent concludes that her refusal to put Z.N. into counseling was the only reason for the children's removal, and there were no efforts she could have made to correct that condition when Z.N. was no longer in her care.

¶ 34 Respondent's argument is unavailing for several reasons. Conclusions articulated in the service plan are those of DCFS, not the trial court, which may or may not agree with those conclusions. Therefore, respondent's inapt reliance on DCFS's conclusion as to why the children

came into care is of no relevance without looking at what the trial court articulated as its reasons for finding the children neglected and removing them from their mother's care. Moreover, respondent ignores other parts of the same service plan that also list her failure to comply with recommended services as reasons that the children came into care, such as the opening paragraph, which reads in part: "[Respondent] refused individual counseling, despite a court order being in place. Due to this protective custody of the minors occurred." Furthermore, respondent is factually incorrect in her assertions that the State was aware of several of its stated grounds for removal prior to the original dispositional order. At the unfitness hearing, the State articulated to the court that it was unaware of the construction site incident until after the original dispositional order: "This information was not known until after the disposition date." As to respondent's failure to provide DCFS with personal information on other adults living in her home, this issue did not arise until July 13, 2018, when the CWS and YSN counselor visited with respondent at her home, which was two days after the July 11 dispositional order. Finally, respondent's refusal to complete an MHA also came during the July 13 meeting, where she told the CWS that MHA's were for "crazy people," and that she was not "crazy."

¶ 35 Not only is respondent incorrect in her conclusions regarding the State's motion to modify guardianship, but she completely ignores the reason the children were adjudicated neglected, which is a large part of why they were removed from her care. The original and primary issue that led to Z.N.'s and L.N.'s adjudication of neglect was the injurious environment based upon the history of domestic violence in respondent's home. Respondent stipulated that the children were neglected and agreed to follow the recommendations of DCFS to correct this underlying condition. These recommendations included an MHA, individual counseling, domestic violence group

counseling for respondent, and individual counseling for Z.N. based on her exposure to domestic violence.

¶ 36 The State presented evidence that, during the nine-month period from November 2018 to August 2019, respondent failed to attend a scheduled neuropsychological evaluation, did not complete parenting education, was discharged from individual counseling for lack of attendance, misled her caseworker regarding her counseling attendance, and engaged in an undisclosed relationship with a person who had a history of domestic violence. The State additionally presented evidence that respondent was inconsistent in attending visitations and that she missed three drug tests during the period. The trial court set forth in detail the particular facts upon which it relied, which were that respondent (1) did not complete parenting classes, (2) participated in no individual counseling during the first several months of the nine-month period, (3) provided no proof that she had attended domestic violence group counseling, (4) was inconsistent in visiting with the children, and (5) missed three drug tests. Based on these factual findings, the trial court concluded that the State proved by clear and convincing evidence that respondent had failed to make reasonable efforts or progress during the nine-month period.

¶ 37 In November 2018, at the start of the nine-month period in question, Z.N. and L.N had already been removed from respondent's care. Respondent had previously stipulated that the children were neglected based on domestic violence in the home. She agreed to follow the recommendations of DCFS and knew that she had to perform certain tasks in order to regain the privilege of caring for her children. In this vein, respondent failed. The trial court's finding that respondent failed to make reasonable efforts to correct the conditions that led to the children's removal from her care or to make progress toward the return of the children was not against the manifest weight of the evidence.

¶ 38                                    III. CONCLUSION

¶ 39    For the reasons stated, we affirm the judgment order of the circuit court of Winnebago

County finding respondent an unfit parent under the Adoption Act.

¶ 40    Affirmed.