NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 251328-U

NO. 4-25-1328

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 29, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Tazewell County |
| Petitioner-Appellee, | ) | No.   21JA147 |
| v. | ) | |
| Breonna C.-B., | ) | Honorable |
| Respondent-Appellant). | ) | Katherine G. P. Legge, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Steigmann and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, finding the trial court's judgment terminating
respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    In December 2024, the State filed a petition to terminate the parental rights of
respondent, Breonna C.-B., to her minor child, L.B. (born in November 2020). Following the
fitness and best-interest hearings, the trial court granted the State's petition and terminated
respondent's parental rights. (The parental rights of the minor's father were also terminated;
however, he is not a party to this appeal.) On appeal, respondent argues the court's fitness and
best-interest determinations were against the manifest weight of the evidence. We disagree and
affirm.

¶ 3                               I. BACKGROUND

¶ 4    In May 2021, the State filed a shelter care petition pursuant to section 2-3(1)(b) of

the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)), contending the minor's environment was injurious to her welfare. The petition alleged numerous incidents involving respondent's substance abuse and history of domestic violence. Following a hearing, the trial court entered a temporary custody order placing the minors in the custody of the Illinois Department of Children and Family Services (DCFS).

¶ 5        In September 2021, the trial court entered an adjudicatory order finding the minor neglected after respondent waived a factual basis. The court found the State had proven by a preponderance of the evidence the facts as alleged in the shelter care petition. The court subsequently entered a dispositional order making the minor a ward of the court after finding respondent unable for reasons other than financial circumstances alone to properly care for the minor. Custody and guardianship of the minor were placed with DCFS, and respondent was ordered to cooperate with DCFS's directives.

¶ 6        Over the next couple of years, the minor resided in a traditional foster home, and respondent substantially complied with DCFS directives and progressed toward the minor's return home. Respondent subsequently had a mental health episode in early 2024 and was indicated by DCFS for neglect regarding a different minor, who is not a party to this appeal.

¶ 7        In December 2024, the State filed a petition to terminate respondent's parental rights, alleging she was unfit for failing to make reasonable progress toward the return of the minor to her care within a nine-month period after the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2024)). The relevant nine-month period was February 16, 2024, through November 16, 2024.

¶ 8                              A. Fitness Hearing

¶ 9        A fitness hearing was held on September 2, 2025. LaDonna Boken-Buckley, a

caseworker with FamilyCore, testified she was assigned to the case in 2023. She confirmed respondent was ordered to engage in various services, including (1) a substance abuse assessment and treatment, (2) parenting classes, (3) counseling, (4) drug screenings three times per month, (5) a psychological evaluation, (6) cooperation with DCFS, (7) release paperwork, (8) stable housing, (9) report any change of address within three days, and (10) visitations with the minor. Boken-Buckley stated respondent completed the substance abuse assessment and treatment; however, she noted that on June 18, 2024, respondent tested positive for cocaine. She also noted respondent's drug tests showed "extremely high levels" of amphetamines. She recalled respondent admitting in open court on February 20, 2024, that she was misusing her Adderall. Boken-Buckley learned respondent had attempted to refill her prescriptions for oxycodone and Percocet early. She also discussed respondent's issues with anxiety during the nine-month period, explaining there were multiple emergency room visits for "panic attacks." During one visit, respondent denied inpatient treatment "because she didn't want it used against her."

¶ 10       During a visit with L.B. in August 2024, respondent vaped during a visit with the minor, despite having been told not to vape during her visits. She said respondent failed to inform her of a relationship she had with Zachery F. Boken-Buckley mentioned respondent's previous issues with domestic violence and unhealthy relationships. During a visit on February 17, 2024, respondent denied being in a relationship, but she later posted a picture online of her with L.B. and Zachery F. at a hockey game. Boken-Buckley later learned Zachery F. had been recently released from prison. Respondent denied being in a relationship with Zachery F., but L.B.'s foster parents informed Boken-Buckley that respondent had introduced Zachery F. to them as her boyfriend. Boken-Buckley learned that in July 2024, respondent had a single sexual encounter with Kyle B., the minor's father.

¶ 11    Boken-Buckley confirmed respondent failed to attend numerous scheduled home visits from August through October 2024. Due to an incident in court, visits with respondent were changed to occur at the agency. On June 11, 2024, Boken-Buckley visited respondent's home to find she was not there and subsequently learned she had left her other child (who is not a party to this appeal) "home alone while she went to McDonald's." This incident caused respondent to be indicated for neglect by DCFS.

¶ 12    On cross-examination, Boken-Buckley conceded L.B.'s goal was return home, even when the agency was aware respondent's drug tests had revealed high levels of amphetamines. She also conceded there had been no allegations respondent had abused her oxycodone or Percocet prescriptions. She stated L.B. had a bond with both respondent and her foster parents.

¶ 13    The trial court admitted into evidence, without objection, four exhibits pertaining to respondent's drug tests, counseling records, and other healthcare records.

¶ 14    Dr. Micah Boehr testified on behalf of respondent. Dr. Boehr prescribed respondent Adderall and noted respondent had lost weight, which would have affected the concentration levels of the substance on a drug test. Dr. Boehr did not observe any signs of Adderall abuse with respondent. On cross-examination, Dr. Boehr did not recall whether respondent had notified his office that she was "doubling up" her Adderall use by taking both doses in the morning.

¶ 15    The hearing resumed on October 14, 2025, with respondent testifying on her own behalf. She described her state of mind in February 2024 as "super scared and super nervous that [she] was going to lose [L.B.]" She explained her relationship with Zachery F. was a mistake and that she should have contacted her caseworker. She denied being aware of Zachery F.'s background. She also denied continuing a relationship with him after learning about his criminal

history. She admitted to occasionally having emotional outbursts toward her caseworker, but she said the outbursts were out of care for L.B.

¶ 16        On cross-examination, respondent admitted to revoking her release of medical records for Dr. Boehr to DCFS. She said it was because she did not want Boken-Buckley to know that she had been "talk[ing] bad about [her]" with Dr. Boehr. She admitted to failing to attend a psychological evaluation the agency had arranged for her. The reason respondent gave for failing to attend the evaluation was because the agency did not give her an address for the evaluation. On redirect examination, respondent explained she revoked the release of information to the agency because she "was not mentally stable" and was working on "things" and "medications" with her physician.

¶ 17        In rebuttal, Boken-Buckley testified respondent continued to have a relationship with Zachery F., even after she told respondent about his criminal history. She described a photograph from social media of respondent and Zachery F. in March 2024 at "a restaurant or a bar scenery." She said respondent had told her Zachery F. was a "positive support" and she would continue to communicate with him. On cross-examination, Boken-Buckley stated she was able to identify respondent from a photograph that did not reveal her entire face but resembled her. She clarified respondent had told her she would continue to communicate with Zachery F. but would not see him in person. On cross-examination by the guardian *ad litem* (GAL), Boken-Buckley said she did not believe respondent would terminate her in-person relationship with Zachery F. She explained respondent had a "history of deception."

¶ 18        Jill Bachman, who also worked for FamilyCore, testified she was involved in e-mail communications between Boken-Buckley and respondent in late September 2024. Bachman explained the agency was able to secure a psychological evaluation appointment ahead of schedule

and provided respondent with a letter for her employer, but respondent still failed to attend the meeting. She also noted respondent abruptly left a meeting on September 27, 2024. She also recalled an e-mail from respondent advising the agency to talk to respondent's attorney and that she was "done." Bachman understood the e-mail to convey respondent was done communicating with the agency. On cross-examination by the GAL, Bachman said respondent never reached out to the agency for details about the psychological evaluation.

¶ 19 The trial court identified the "central" issue in the case as respondent's mental health issues and use of prescription medications. The court found the evidence was insufficient to support the State's contention the elevated amphetamine levels showed respondent had been abusing Adderall. The court explained:

> "There were several partial hospitalizations, emergency room visits based on extreme anxiety, suicidal comments I think at one point, and just a real mental instability that, you know, at the beginning of [the nine-month] period it was established that [respondent] was fit and she had her daughter with her and then things kind of came crashing down around that."

The court said respondent became unfit "for not only mental health but also some layers of deception and concealing information." The court referenced respondent's relationship with Zachery F. The court found respondent's testimony she cut off all communication with Zachery F. was contradicted by Boken-Buckley's testimony she only eliminated in-person contact with him. The court emphasized numerous instances where respondent tried to hide information from her caseworker, including her relationship with Zachery F. and a sexual encounter with the minor's father, whom she had domestic violence issues with in the past. Regarding the counseling records, the court noted respondent became more "guarded, irritable." The court did not find respondent

credible on the issue of failing to attend the psychological evaluation. The court concluded the State had met its burden by clear and convincing evidence and summarized the issues as follows:

"The minor was removed. [Respondent's] fitness was changed to unfit. Mental instability throughout. Declined inpatient treatment. Declined offers from the doctor to switch medication. And in spite of the opportunities that the casework team provided, would fail to avail herself of several other services that could have affected things differently."

¶ 20                               B. Best-Interest Hearing

¶ 21        The matter proceeded to a best-interest hearing on November 25, 2025. Boken-Buckley testified L.B. had lived a "majority of her life with the foster parents." She discussed the foster parents becoming aware that respondent was not only in a relationship with Zachery F., but also that he was observed with respondent and L.B. She explained that respondent hid this information from the agency and Zachery F., who had recently been incarcerated, had not been approved to be around L.B. Ultimately, she explained, the trial court returned all caretaking of the minor back to the foster parents. Boken-Buckley stated the minor had a "very strong bond" with her foster family, who provided her with love and affection and met all of her needs She recalled observing a "handful" of the minor's visits with respondent and said respondent interacted "well" with L.B. She could not comment on respondent's home because home visits with respondent had been discontinued due to respondent being "verbally aggressive." She noted respondent had pleaded guilty to retail theft in June 2025. She said respondent had reported to her physician she had a sexual encounter with the father of L.B. a year prior and that she had been in a 10-year, abusive relationship with him prior to that. Boken-Buckley explained respondent had issues with "[u]nhealthy relationships and poor decisionmaking. Being honest and taking

accountability." Discussing accountability, she noted respondent denied testing positive for cocaine in May 2023 and June 2024. She noted there were no concerns regarding the minor with the foster parents.

¶ 22 On cross-examination, Boken-Buckley noted respondent had completed a psychological evaluation, attended counseling, and submitted to drug testing. Regarding respondent's visits with the minor, she said respondent interacted well and that she "loves her daughter." Outside of an incident where respondent had vaped, Boken-Buckley could not recall any incidents during visits with the minor. She agreed respondent and the minor had a bond.

¶ 23 During cross-examination by the GAL, Boken-Buckley noted concerns in the past when respondent had unsupervised visits with the minor, including having L.B. around her biological father and Zachery F. On redirect examination, she stated Dr. Boehr discharged respondent as a patient after she missed an appointment.

¶ 24 Jack K., L.B.'s foster parent, testified consistently with Boken-Buckley. He observed the minor to be "a little out of sorts[ and] emotional" following visits with respondent. He expressed prolonging uncertainty in the minor's care would not be in her best interest. He stated he and his wife would be willing to adopt the minor. He noted the only stability in the minor's life had been with her foster family. He recalled respondent bringing Zachery F. to his home to pick up the minor. He said that at the time, he was not aware of his criminal history. On cross-examination, he noted "various ups and downs over the last few years with the amount of time [the minor had] been able to [visit] with [respondent]."On cross-examination by the GAL, he said respondent did not reach out to him or his wife to ask about the minor.

¶ 25 Respondent testified she visited with L.B. monthly and during her visits, they performed activities together. She said L.B. became emotional at the end of the visits and told

- 8 -

respondent, "[M]ommy, I don't want you to leave. Mommy, why can't I go with you?" She stated she lived by herself and would permit a home visit for a safety assessment. She averred she could provide for L.B.'s needs. She confirmed she had been compliant with her drug testing and counseling. Respondent said she was told by Boken-Buckley not to contact the minor's foster parents directly.

¶ 26    The trial court stated it had considered the best-interest factors and noted L.B.'s "safety and welfare, food, shelter, clothing, you know, her health is all being addressed in her [foster] placement." The court noted the minor's foster parents had been her caretakers since she was seven months old. She was now five years old. The court found the minor had a bond with both respondent and her foster parents, but it considered the bond with the foster parents stronger, noting "she asks for [her foster parents] when she's upset." The court said it was "disheartened" to hear Dr. Boehr had discontinued treating respondent. The court also stated it could not "bypass" its issues with respondent's credibility. The court found the factors of permanency, the least disruptive placement, continuity of affection, and sense of security favored the foster parents. The court concluded it was in the minor's best interest to terminate respondent's parental rights.

¶ 27    This appeal followed.

¶ 28    II. ANALYSIS

¶ 29    On appeal, respondent argues the trial court's fitness and best-interest determinations were against the manifest weight of the evidence. We address each claim in turn.

¶ 30    A. Findings of Parental Unfitness

¶ 31    Parental rights may not be terminated without the parent's consent unless the trial court first determines, by clear and convincing evidence, the parent is unfit under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

"A trial court's determination that a parent's unfitness has been established by clear and convincing evidence will not be disturbed on review unless it is contrary to the manifest weight of the evidence." *Id.*

¶ 32 Respondent contends the record demonstrates she made actual progress, despite the trial court finding she had failed to make reasonable progress over the relevant nine-month period. She notes the condition that led to L.B.'s removal was "a severe psychiatric episode complicated by the consumption of alcohol." She argues she continuously engaged in mental health treatment, yet the court penalized her for failing to attend a psychological evaluation on short notice. She also notes she was physically at the agency attending a counseling session the day before she missed the psychological evaluation. She contends being penalized for missing the evaluation would place administrative directives over her actual rehabilitative efforts. See *In re S.J.*, 233 Ill. App. 3d 88, 120 (1992) ("[C]ompliance with DCFS service plans is a means to a desired end, not the end in itself.").

¶ 33 Respondent also notes the trial court's finding that she had tested positive for cocaine and had elevated amphetamine levels was based on the testimony of Boken-Buckley. However, she argues Boken-Buckley was not permitted to testify or provide a summary of the contents of any records regarding drug testing. Respondent concludes by contending her intensive psychiatric hospitalization and consistent mental health treatment demonstrated actual progress, contrary to the court's findings. We disagree.

¶ 34 While the trial court found respondent had unreasonably failed to take advantage of the opportunity to undergo a psychological evaluation, the court noted numerous other decisions respondent made that, in sum, demonstrated her failure to make reasonable progress. Pursuant to section 1(D)(m)(ii) of the Adoption Act, a parent may be found unfit if she fails "to make

reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2024). Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007). This court has explained reasonable progress exists when a trial court

> "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

We have also emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88 (quoting *L.L.S.*, 218 Ill. App. 3d at 461).

¶ 35　　　　In the case *sub judice*, the trial court's unfitness finding was based on more than respondent's failure to attend a psychological evaluation. The evidence from the fitness hearing showed she had been deceptive toward DCFS about who she was permitting around L.B., particularly during the brief period she had unsupervised visits and overnight care of the minor. She tested positive for cocaine, and her counseling records showed she was withdrawing and struggling with her mental health. While respondent contends the evidence she consumed cocaine or had elevated amphetamine levels came solely from Boken-Buckley, the court admitted evidence of respondent's drug testing and explicitly stated it did not find the elevated amphetamine levels dispositive. Accordingly, we disagree the court prioritized administrative directives from DCFS

- 11 -

over any actual progress respondent had made. The evidence shows mental health and substance use were the driving forces behind L.B. initially entering protective custody. The record shows respondent had begun to make progress but then regressed with her mental health issues. Therefore, we find the court's determination respondent was unfit was not against the manifest weight of the evidence.

¶ 36                              B. Best-Interest Determination

¶ 37        After a trial court finds a parent is unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). The trial court's best-interest determination will not be reversed unless it is against the manifest weight of the evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. "A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result." *Id.*

¶ 38        At the best-interest hearing, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. See *D.T.*, 212 Ill. 2d at 367. The trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). However, the court is not required to make a specific reference to each factor in its findings. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. These statutory factors include:

> "(1) the child's physical safety and welfare; (2) the development of
> the child's identity; (3) the child's background and ties, including
> familial, cultural, and religious; (4) the child's sense of attachments,
> including love, security, familiarity, and continuity of affection, and
> the least-disruptive placement alternative; (5) the child's wishes;

(6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

¶ 39 Respondent notes she had completed most of the court-ordered services early on in the proceedings and had progressed to a transition of having L.B. return home, which included overnights and extended visits. After custody returned to the foster parents, respondent notes she continued actively participating in the minor's life and maintained a strong bond. She argues maintaining her parental rights would have preserved her vital connection with L.B. She also argues the State had failed to show any specific benefit to terminating her parental rights. Again, we disagree.

¶ 40 In this case, the evidence demonstrated the minor's needs were being met by her foster parents. The trial court found most of the statutory factors favored terminating respondent's parental rights. Moreover, the court emphasized the need for finality, given L.B. had been in protective care for more than four years. The record supports respondent's argument she had a strong and loving bond with L.B.; however, "at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. In this case, stability after more than four years of protective custody was imperative for L.B. moving forward.

¶ 41 The trial court's determination to terminate respondent's parental rights was not

taken lightly. As a reviewing court, we afford great deference to a trial court's best-interest findings because it sits in a superior position to observe the witnesses, judge credibility, and assess the evidence. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. Based on our review of the evidence, we find the court's best-interest findings were based on an appropriate consideration of the statutory factors. Accordingly, we conclude the court's best-interest determination was not against the manifest weight of the evidence.

¶ 42                                    III. CONCLUSION

¶ 43            For the reasons stated, we affirm the trial court's judgment.

¶ 44            Affirmed.